Kenneth R.M. THOMPSON, Kenneth R.M. Thompson, P.C., Kenneth R.M. Thompson, P.C. Profit Sharing Plan and Trust, Kenneth R.M. Thompson, P.C. Money Purchase Plan and Trust, Walter W. Hanna, Roger R. Bruchan, Dorothy Karen Bruchan, John P. Buss, and Mary A. Buss, Plaintiffs–Appellants, Cross–Appellees,

v.

William PAASCHE, Joann Paasche, Defendants–Appellees, Cross–Appellants,

Miller Brothers, a co-partnership and CEMCO, a corporation, Defendants–Appellees.

Nos. 89–1262, 89–1869 and 89–1870.

United States Court of Appeals, Sixth Circuit.

Submitted May 7, 1991.

Decided Nov. 29, 1991.

Richard A. Gaffin, Miller, Canfield, Paddock & Stone, Grand Rapids, Mich., James R. Hermann, Michael W. Ford, David T.B. Audley, Chapman & Cutler (briefed), Chicago, Ill., for plaintiffs-appellants, and cross-appellees.

Mark R. Bendure, Victor S. Valenti (briefed), Detroit, Mich., Scott S. Brinkmeyer, Mika, Meyers, Beckett & Jones (briefed), Thomas Richard Behm, Gruel, Mills, Nims & Plyman, Grand Rapids, Mich., for defendants-appellees, and cross-appellants.

William Paasche, pro se.

Before KRUPANSKY and BOGGS, Circuit Judges, and WELLFORD, Senior Circuit Judge.

BOGGS, Circuit Judge.

This case involves an appeal and a cross-appeal of a dispute regarding the sale of land located on Lake Michigan by the defendants, William Paasche and Joann Paasche ("Paasche"), to the plaintiffs. The plaintiffs won judgments against Paasche both for common law fraud and for violating the RICO Act in the land sale.[1] Paasche appeals, arguing that his actions constituted neither fraud nor a violation of RICO. We affirm the verdict on common law fraud but reverse as to the RICO claim. Both sides appeal various aspects of the damages verdict. We affirm all of the district court's rulings on the damages issue. In addition to the fraud and RICO claims, the plaintiffs brought a claim for injunctive relief both against Paasche and against Miller Brothers and CEMCO (collectively "Miller."). The court denied all claims for injunctive relief. We affirm as to Miller, but reverse as to Paasche.

I

William Paasche purchased the land at issue here in the late summer of 1984. This property, (the "Cooper Creek" property) is, by all accounts, very scenic. The lots are very large, and all directly abut Lake Michigan. The beaches are wide, clean, and sandy. Off the beach, one finds beautiful forests remote from the hustle and bustle of city life. The land is surrounded by a National Park.

When Paasche bought this Edenic plot, he agreed to pay $400,000 for the entire lot—10% down, and the rest payable 100 days after the signing of the purchase agreement. Since he didn't have the money on hand to pay for the land, Paasche immediately placed an advertisement in the *Chicago Tribune*, which attracted the attention of several potential purchasers, the plaintiffs in this action.

Paasche divided the property into 19 lots. Fifteen of those lots are 10 acres each, and the rest are about 2½ acres. All of the plaintiffs purchased their property between August and December of 1984. At the

---

1. The Thompson entities won a judgment of $65,488. The base award both for RICO and the common law fraud claim (the damages are the same for both) was $19,200, trebled to $57,600 pursuant to 18 U.S.C. § 1964(c). To this figure, the court added $7,888 in pre-judgment interest on the $19,200, calculated pursuant to M.C.L. § 600.6013(4). Hanna received $23,108 ($6,775 base award, trebled to $20,325, plus $2,783 in pre-judgment interest); Roger and Dorothy Bruchan received $20,380 ($5,975 base award, trebled to $17,925, plus $2,455 in pre-judgment interest); John and Mary Buss received $11,512 (base award of $3,375, trebled to $10,125, plus $1,387 in pre-judgment interest). The court originally awarded $49,838 in punitive damages to be divided among all of the plaintiffs. This figure included the jury verdict of $35,325, plus pre-judgment interest of $14,513. On reconsideration, however, the court vacated its award of punitive damages, concluding that the award was error under Michigan law.

time of the sales, Paasche drafted and entered into protective covenants with each buyer. One protective covenant was a reservation of mineral rights, including oil and gas rights. The covenants were recorded at the same time as were the deeds.

These covenants were executed at the time of the sales, and, were recorded along with the deeds at the time of the sales.[2] The protective covenants are a list of restrictions on use, including two provisions that are at issue here. Item 1 limits the type of "structure" that can be placed on the property:

NO STRUCTURE SHALL BE ERECTED, ALTERED, PLACED, OR PERMITTED OTHER THAN A SINGLE FAMILY DWELLING, AND A PRIVATE GARAGE, AND A GUEST HOUSE OR SERVANTS' QUARTERS FOR ACTUAL SERVANTS OF THE OCCUPANTS OF THE MAIN DWELLING.

(capitalization in original). Item 6 states that "IT IS EXPRESSLY UNDERSTOOD THAT ALL GAS, OIL, AND MINERAL RIGHTS ARE RESERVED FROM THIS CONVEYANCE." (capitalization in original).

Several of the plaintiffs inquired, prior to purchasing the property, about the reason for reserving mineral rights. Although Paasche did not give the same story to all of the purchasers, he did not tell any of them that he planned actually to use the oil and gas rights. His basic theme was that he kept the mineral rights in order to *prevent* oil and gas drilling. He told Kenneth Thompson that, under Michigan law, a "drilling unit" requires eighty acres, and the cooperation of eight landholders. He also told Thompson that any drilling that took place would take place in the woods, off the property, using slant drilling. Paasche had another pitch—a "trust theory"—that he used with Hanna, John and Mary Buss, and Roger and Karen Bruchan, saying that the purpose of the reservation of mineral rights was to keep *other people* from banding together to drill for oil. Paasche also claimed that he and his wife were going to be living in the area them-

selves, so they wanted it pure and unspoiled.

Evidently Roger and Karen Bruchan were the most troubled about the oil and gas rights. When they first discussed the issue with Paasche, they indicated that they wished to consult their lawyer. At this point, Paasche became huffy and defensive. Ultimately, however, they did consult a lawyer. Pursuant to legal advice, they negotiated a clause in their deed prohibiting any drilling on their property.

Whatever reservations they might have had, all of the plaintiffs here ended up purchasing the land from Paasche. Kenneth Thompson, (who evidently made a point of telling Paasche within minutes of meeting him that he was a graduate of Harvard Law School and a partner at a large Chicago law firm), together with various associated entities, purchased three plots of land, more than any other plaintiff. His sale closed in November 1984. All of the other sales closed after Thompson's; the last took place in late December 1984.

While Paasche was telling the plaintiffs that he reserved the oil and gas rights merely to protect the land from exploitation, he was simultaneously negotiating an oil and gas lease with Miller. Prior to most of the closings, in late November, Paasche met with Michael Morton, an agent for Miller, to discuss the possibility of an oil and gas lease. At that meeting, the two reached a tentative agreement; Morton gave Paasche a check for $50,000. Although the two reached their agreement quickly, the process of getting a signed lease recorded took somewhat longer. First, Paasche sent Miller a signed copy of the carbon copy rather than the original. Then, after Miller sent a clean copy of the lease to Paasche, Paasche signed it, but failed to have his signature witnessed and notarized. Paasche finally managed to send Miller a signed, notarized, witnessed, clean copy of the oil and gas lease in December. Miller recorded the lease on January 9, 1985—after the plaintiffs all had already purchased their land. Since the

**2.** None of the parties have challenged the validity of these covenants under state law.

lease was recorded *after* the closings, it did not show up during the course of the plaintiffs' title searches.

The plaintiffs first learned of the oil and gas lease in late April 1985, when they received letters from a company employed by Miller stating that the company planned to do "seismic testing" on the property. This caused a flurry of discussion between the various plaintiffs and the defendants, some of which evidently was quite heated. At this time, Paasche took the position that the mineral rights were his, to do with as he pleased, and that he was perfectly within his rights leasing them to Miller. Ultimately unable to resolve the dispute through negotiation, the plaintiffs filed this lawsuit. Currently, there is no drilling going on at the Cooper Creek property. The Michigan Department of Natural Resources claims that most of the area (about 75%) is a protected wetlands area. We are told that Miller is contesting this determination, but we have not been informed regarding the progress of that litigation.

In their lawsuit, the plaintiffs alleged, *inter alia,* that Paasche defrauded them in the land sale. The basic factual allegation was that Paasche told them that he was keeping the oil and gas rights in order to preserve the natural beauty of the land, when, in fact, he was selling the oil and gas rights at the very same time. The plaintiffs alleged that Paasche violated RICO, and that he committed common law fraud under Michigan law. The jury returned a verdict against Paasche on both the RICO and common law fraud claims, and awarded punitive damages. Despite the fact that Paasche failed to object to the instruction on punitive damages, the district court took them away, holding that, under Michigan law, awarding punitive damages in this situation constituted "plain error."

The plaintiffs also filed a claim against Miller and against Paasche for injunctive relief. The basis of this claim was that the provision in the protective covenant prohibiting "structures" (except single family homes and a guest house or servants' quarters) applies to drilling equipment. This issue was tried before the court in a bench trial concurrently with the fraud and RICO trial against Paasche. The court found in favor of the defendants on this claim.

Both sides have appealed various aspects of the decision below, and we discuss the issues *seriatim.*

## II

### RICO

◼ Paasche appeals the claim against him for violating RICO, arguing that, as a matter of law, his activities could not constitute a "pattern of racketeering activity." The confusion caused by RICO's "pattern" requirement has only been mildly alleviated by the Supreme Court's recent decision in *H.J. Inc. v. Northwestern Bell Telephone Company,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Nonetheless, the case does dispose of the plaintiffs' first contention—that two predicate acts, standing alone, are enough to make a pattern. The plaintiffs rely on Sixth Circuit cases decided prior to *H.J.* In *H.J.,* however, the Court specifically stated that it could not agree with the courts that have held that two predicate acts make a pattern—and the Court specifically singled out one of our cases, *United States v. Jennings,* 842 F.2d 159 (6th Cir.1988), as an expression of the position that it could not agree with. *See H.J.,* 109 S.Ct. at 2899.

◼ In *H.J.,* the Court explained that "there is something to a RICO pattern *beyond* simply the number of predicate acts involved." *Id.* 109 S.Ct. at 2900 (emphasis in original). Relying on the legislative history, the Court invokes the phrase *"continuity plus relationship." Ibid.* (emphasis in original). The Supreme Court explained that there are essentially two types of "patterns": " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with the threat of repetition." *Id.* 109 S.Ct. at 2902. Further, "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a period of time. Predicate

acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Ibid.*

■ Thus, the plaintiffs can prevail if they demonstrated either a closed-ended conspiracy of sufficient duration or an open-ended conspiracy that could have continued into the future. We do not think that the plaintiffs can prevail under either rubric. In *American Eagle Credit Corp. v. Gaskins,* 920 F.2d 352, 354 (6th Cir. 1990), we recently held that, under the analysis of *H.J.,* a scheme lasting from December 1986 to May 1987 was not of sufficient duration to qualify as a pattern of racketeering activity.

Our case is more squarely within the Supreme Court's admonition than was *American Eagle.* Paasche's fraudulent scheme was an inherently short-term affair. He had nineteen lots to sell. Once he sold all of the lots, the scheme was over. It had to be, he had no more land to sell. Thus, his scheme was, by its very nature, insufficiently protracted to qualify as a RICO violation. *Cf. id.* at 955 (Nelson, J., dissenting). This characteristic of the scheme at issue here also serves to distinguish it from the scheme in *United States v. Busacca,* 936 F.2d 232 (6th Cir.1991). In *Busacca,* the defendant had illegally expropriated funds from a union pension fund. We reasoned that his ongoing control of the union and the funds constituted a sufficient threat of ongoing activity to give rise to RICO liability. *Id.* at 238. Here, by contrast, the instrumentality used to commit the fraud—the land—was sold during the course of the fraudulent conduct, which itself lasted only a few months.[3] And there is no indication of any continuing opportunity or scheme to purchase or resell potentially oil-bearing land.

The plaintiffs claim that this court ought not apply *H.J.* retroactively. However, retroactivity need not be addressed when a decision does not change the law. *James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 2443, 115 L.Ed.2d 481 (1991) ("It is only when the law changes in some respect that an assertion of nonretroactivity may be entertained."); *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971) ("[T]he decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied ... or by deciding an issue of first impression whose resolution was not clearly foreshadowed." (citations omitted)). *H.J.* did not change the law; rather, the Supreme Court attempted to "develop a meaningful concept of 'pattern' within an existing statutory framework." *H.J.,* 109 S.Ct. at 2899. Therefore, nonretroactivity need not be considered. Applying the principles from *H.J.,* and the cases in which we have discussed *H.J.,* to our case, we find, as a matter of law, that the plaintiffs failed to prove a RICO violation.

### III

### FRAUD

The plaintiffs also prevailed on their common law fraud claim. Paasche makes two arguments here. First, he claims that his statements constituted promises or predictions regarding future events, which cannot, as a matter of law, amount to fraud. And, second, he claims that the court erred in allowing parol evidence. We do not find either argument meritorious. Accordingly, we uphold the verdict against Paasche for common law fraud. We discuss each argument in turn.

### A

### PREDICTIONS

■ Paasche claims that the statements he made to the plaintiffs constitute prom-

---

**3.** The plaintiffs also argue that Paasche had control of their money, which he could then use to purchase similar land with which to concoct other similar schemes. This analysis would eviscerate the limiting principle established by the Supreme Court in *H.J.* Most crimes involve gainful activity. If control of money were enough to supply the requisite continuity, then continuity would surely almost always exist. Any other holding would, at least implicitly, overrule our decision in *American Eagle.*

ises or predictions regarding the future, and he invokes the common law rule that promises or predictions about the future do not give rise to liability for fraud. This argument is flawed in two respects. First, at the very same time that he told the plaintiffs that his purpose in reserving the mineral rights was to preserve the natural beauty of the land, Paasche was negotiating a mineral rights lease. Indeed, the plaintiffs all closed after Paasche had already signed the oil and gas lease with Miller. Accordingly, the statements that Paasche made were not just predictions or promises, but rather were misrepresentations regarding then-existing facts.[4]

 Second, under Michigan law, one can be held liable for broken promises when one has, at the time of the promise, a then-existing bad faith intent to break the promise. *Van Marter v. American Fidelity Life Insurance Company*, 114 Mich. App. 171, 318 N.W.2d 679, 684 (1982). Paasche made statements while in the process of negotiating his lease. He agreed to the lease in November, but the lease didn't make it to Miller until late December— after the plaintiffs had already completed their title searches. The jury could have believed that this was intentional, and inferred from that a present bad-faith intent from his actions. Paasche wants this court to step into the shoes of the jury, and replace its factual judgment with our own. This we decline to do.

## B

### PAROL EVIDENCE

 Paasche also claims that the court erred by admitting testimony regarding the oral representations made to the plaintiffs regarding the protective covenants. It is

well established that evidence that would normally be inadmissible under the parol evidence rule *can* be admitted to show fraud. *Goodwin, Inc. v. Coe*, 392 Mich. 195, 220 N.W.2d 664, 668 (1974). Accordingly, the court did not err by admitting the plaintiffs' testimony.

## IV

### DAMAGES

Both sides contest the issue of damages. Paasche maintains that the court erred in allowing the plaintiffs' expert, Stanley Boelkins, to testify on the damages issue. He also claims that the plaintiffs weren't damaged, since the ban by the Michigan Department of Natural Resources on drilling on more than 75% of the property effectively prevents drilling, and none has taken place. The plaintiffs argue that the district court erred in vacating the award of punitive damages. We conclude that the district court correctly applied the law of Michigan in calculating the damages. We do not believe that the court erred in allowing Boelkins to testify or in finding that the plaintiffs were damaged. Nor do we believe that the court erred in vacating the award of punitive damages, since awarding punitive damages is "plain error" under Michigan law.[5]

## A

### THE BOELKINS TESTIMONY

 Paasche argues that the court abused its discretion by allowing the plaintiffs' witness, Stanley Boelkins, to testify. Boelkins testified for the plaintiffs as their damages expert. Originally, the plaintiffs planned to call Lawrence Kivela as a wit-

---

**4.** Paasche also cites much of his own testimony from the trial, as if the jury were bound credulously to accept his every word. Paasche's version of the events in question differed substantially from that of the plaintiffs. Credibility judgments are within the province of the jury. Even if all we had here was conflicting testimony, the jury could have resolved the conflict against Paasche. In this case, the jury also had evidence other than the testimony of the parties—such as Paasche's dilatory conduct with respect to the mineral rights lease that prevent-

ed it from being recorded—that supports the inference of fraud.

**5.** Although we affirm the district court in its determination of the base award of damages— which is, of course, the same both for the RICO and the fraud claim—our ruling reversing the verdict on the RICO claim will mean that the plaintiffs will no longer be entitled to treble damages.

ness. He is listed as the plaintiffs' expert in the pretrial order, which was entered on July 5, 1988. Kivela, however, was unable to testify. On August 29, the plaintiffs filed a responsive pleading that included an affidavit by Boelkins. In the affidavit, Boelkins indicated that he was ready, willing, and able to testify at the trial. On September 15, the plaintiffs filed documents stating that Boelkins would be called as a witness. Finally, on September 30, the plaintiffs filed an amendment to the pretrial order stating that Boelkins *would* be called. On October 17, Paasche asked the trial court to strike Boelkins as a witness. The court denied the motion without going into its reasons. Boelkins did testify at trial, apparently quite effectively.

■ Paasche now argues that the trial court committed reversible error in allowing Boelkins to testify. On appeal, Paasche relies on Rule 16(e) of the Federal Rules of Civil Procedure. Rule 16(e) provides that, after the pretrial order is entered, that order "shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice." Although Paasche did move to strike Boelkins as a witness, he did not base that objection on Rule 16(e). Paasche thereby waived any objection that he might have had under this rule. We do not normally consider arguments not properly raised below. *Chandler v. Jones*, 813 F.2d 773, 777 (6th Cir.1987).

Paasche did, however, present two arguments below against allowing Boelkins to testify, which he reiterates here, though framed in terms of the alleged Rule 16 violation. He claims that to have been prejudiced in two ways. First, Paasche claims that he was prejudiced because he was unable to get a witness to refute Boelkins. Although Boelkins replaced Kivela, the substance of his testimony was the same as Kivela's. Accordingly, any witness able to refute Kivela could as easily

refute Boelkins. The other claim advanced by Paasche is that he was prejudiced because he was precluded from deposing Boelkins, as discovery was closed. Paasche knew that the plaintiffs planned to call Boelkins at least two months prior to the start of trial. He never even *asked* the trial court to reopen discovery to allow him to depose Boelkins. Such motions are routinely granted in similar circumstances. Although Paasche complains about "trial by ambush," it is clear that this was one ambush he saw coming. Had Paasche asked for, and been refused, the right to depose Boelkins prior to trial, we might have a different case.

### B

### THE DAMAGES VERDICT

■ Paasche claims that the damages in this case are too "remote" and "speculative." Michigan law distinguishes between the *fact* of damages and the *amount* of damages. Once a plaintiff has established that there are damages, a plaintiff will not be precluded from recovering because of inability to demonstrate with precision the exact amount of the damages. *See, e.g., Godwin v. Ace Iron & Metal Co.,* 376 Mich. 360, 137 N.W.2d 151 (1965); *Lorenz Supply Co. v. American Standard, Inc.,* 100 Mich.App. 600, 300 N.W.2d 335, 340 (1981). Indeed, under Michigan law, doubts as to the amount of damages are generally resolved against the wrongdoer. *Lorenz,* 300 N.W.2d at 340.

■ Paasche concedes that this is the law of Michigan. He claims, however, that the plaintiffs' claim fails because there has been no drilling on the property and that they therefore have not been damaged. He seems to misunderstand the nature of the testimony. Boelkins testified that the fact of the *mineral lease itself,* appearing as a part of the title chain, reduced the market value of the property. Accordingly, the plaintiffs have been damaged, inasmuch as the market value of their land has been reduced.[6]

---

**6.** Even if Boelkins overestimated the *amount* of the damage caused by the lease, it is perfectly

reasonable that there would be some damage.

In his reply brief, Paasche makes something of a switch in positions. Relying on an argument advanced by the plaintiffs, he claims that the plaintiffs have failed to prove damages under the "benefit of the bargain" approach employed in Michigan. Essentially, he argues, based on the Boelkins testimony, that the land, even with the lease, is worth what the plaintiffs paid for it. Thus, he claims that the plaintiffs got the benefit of their bargain. Paasche is arguing from the wrong baseline. Under Michigan law, a fraud plaintiff is entitled to the benefit of the *bargain*—in other words, what the purchaser would have gotten had the representations been true. *See, e.g., Newton Realty v. Fileccia,* 174 N.W.2d 603, 605 (1969). Accordingly, the plaintiffs' expert correctly calculated the damages by trying to ascertain the difference in the value of the land with the mineral lease and without it.

## C

### PUNITIVE DAMAGES

Initially, the plaintiffs were awarded punitive damages. The jury had been instructed that it could award punitive damages, and Paasche failed to object to this instruction. Under Michigan law, however, punitive or exemplary damages cannot be awarded where actual damages are sufficient to make the plaintiff whole. *Hayes Albion v. Kuberski,* 421 Mich. 170, 364 N.W.2d 609, 617 (1984). Moreover, awarding such damages constitutes "plain error." *Jackson Printing Co., Inc. v. Mitan,* 169 Mich.App. 334, 425 N.W.2d 791, 794 (1988). After the verdict had been rendered, Paasche moved for the district court to strike the punitive damages, and the court did so.

Rule 51 of the Federal Rules of Civil Procedure would, on its face, seem to preclude a party from objecting after the fact to a jury instruction after acquiescing by failing to object before the fact. Nonetheless, we have long recognized an exception for "plain error." *See, e.g., Ivey v. Wilson,* 832 F.2d 950, 955 (6th Cir.1987); *Gomez v. Great Lakes Steel Division, National Steel Corporation,* 803 F.2d 250,

257 (6th Cir.1986). We have done so, we might add, with the blessing of the Supreme Court. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981).

The plaintiffs claim, however, that *Springfield v. Kibbe,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) overrules this established principle. For several reasons, we do not believe that *Kibbe* has anything to say about the plain error rule, as it is still applied in this circuit. In *Kibbe,* the Supreme Court, in a *per curiam* opinion, dismissed, as improvidently granted, a writ of certiorari, where a party had failed to raise the issue at trial and before the court of appeals. The error, if it was error, in that case surely was not plain— since it was the very issue that the Court granted the petition for certiorari to consider. *See Kibbe,* 480 U.S. at 258, 107 S.Ct. at 1115. The Court stated that it normally did not consider issues "not raised or litigated in the lower courts," and indicated that the rule against doing so "has special force where the party seeking to argue the issue has failed to object to a jury instruction." *Id.* at 259, 107 S.Ct. at 1115. Thus, the basis of the Court's decision was the fact that the issue had not been developed below, and the fact that the party failed to raise the issue only highlighted that problem.

Further, the Court stated that there was "no jurisdictional bar" to reaching the issue, but rather that there are "considerable prudential objection[s] to reversing a judgment because of instructions that petitioner accepted, and indeed itself requested." *Ibid.* Although this language might lend itself to the inference that there are prudential problems with reversing based on instructions that were not objected to, we have already noted that the instructions were not, in that case, plain error.

Finally, the Court stated the case was not a "proper occasion for us to exercise our discretion to decide an issue despite petitioner's failure to preserve it." *Id.* at 260, 107 S.Ct. at 1115–16. We think that this language makes it quite clear that the Supreme Court spoke, in that case, only

regarding the proper exercise of its discretionary jurisdiction. This is buttressed by the fact that the holding in the case is only that the petition for a writ of certiorari was improvidently granted. Thus, the case is not, strictly speaking, a decision on the merits at all. Any language in the case that might remotely bear on the issue would, therefore be pure dicta. In sum, we fail to see how a decision regarding the Supreme Court's exercise of its discretionary jurisdiction is at all relevant to us— since we, after all, have no choice in the matter.[7]

## V

## THE INJUNCTION

The plaintiffs asked for, in effect, two injunctions. They wanted the district court to enjoin Miller from exercising its rights under the oil and gas lease, and they wanted to prevent Paasche from transferring the oil and gas rights to anyone else. The two claims for injunctive relief raise different issues, so we discuss them separately.

### A

### MILLER

■ The claim against Miller rests on the premise that the protective covenants apply to the mineral estate and, further, that oil and gas drilling equipment is a "structure" prohibited by the agreement. The court held in favor of Miller. We agree, although we reach our conclusion by a somewhat different route than the district court followed. All of the deeds contained specific reservation of oil, gas, and mineral rights. Paasche owned the mineral estate, and he continued to own it after the sales took place. The provision in the protective covenants was not necessary in order to withhold the ownership of the mineral estate; that had been accomplished in the deed.

Although the operative provision in the protective covenant is somewhat awkwardly worded, we think that its import is clear enough. The protective covenant specifically provides that "ALL GAS, OIL, AND MINERAL RIGHTS ARE RESERVED FROM THIS CONVEYANCE." (all capitals in original). A covenant may not be, strictly speaking, a conveyance, but the protective covenant itself is the only thing that the language "this conveyance" could refer to. Therefore, we read the protective covenant to say that the gas, oil, and mineral rights are exempted from its terms. Thus, the limitations imposed by the various protective covenants regarding "structures" simply do not apply to the mineral estate. Accordingly, the court did not err in failing to enter an injunction against Miller.

### B

### PAASCHE

■ The plaintiffs maintain that the court should have granted them an injunction against Paasche, forbidding any transfer of the mineral estate, other than the one to Miller, regardless of the outcome of the dispute with Miller. The court held that it was precluded, as a matter of law, from doing this. We disagree. Michigan law allows for contract reformation in the case of fraud. *See Hand v. Dayton–Hudson*, 775 F.2d 757, 760 (6th Cir.1985); *Stein, Hinkle, Dawe & Associates, Inc. v.*

---

7. We are aware that the Seventh Circuit has reached a contrary conclusion, relying on *Kibbe,* to hold that the "plain error" rule is no longer good law. *Deppe v. Tripp,* 863 F.2d 1356 (7th Cir.1988). We conclude that *Kibbe* deals only with the question of when the Supreme Court properly exercises its discretionary jurisdiction, an issue inherently beyond our purview. Even if we felt that *Kibbe* left us free to abandon the plain error rule, we find the reasoning adopted by the Seventh Circuit unpersuasive. The Seventh Circuit suggests, in effect, that eliminating the "plain error" rule gives law-

yers the correct incentives to raise objections in a timely manner. *See Deppe,* 863 F.2d at 1360–61. Lawyers also have, however, a duty of candor to the court. The job of a lawyer is to present the law in the light most favorable to the client, but not to misrepresent the law when it clearly goes against the client. By retaining the plain error rule, we give lawyers an incentive not to overreach. Fed.R.Civ.P. 11 and F.R.A.P. 38 serve similar functions. In effect, the elimination of the plain error rule gives lawyers the incentive to try and "slip one by."

*Continental Casualty,* 110 Mich.App. 410, 313 N.W.2d 299 (1981). The rationale in reforming a contract is to eliminate inequities resulting from the fraud. *See Hand,* 775 F.2d at 761. Accordingly, we conclude that the court erred in holding that it was precluded, as a matter of law, from giving the plaintiffs injunctive relief as to Paasche.[8]

## VI

To recapitulate: the common law fraud verdict, the denial of injunctive relief against Miller, and the court's various rulings on the damages issues are AFFIRMED; the RICO verdict and the denial of injunctive relief against Paasche are REVERSED. The case is REMANDED to the district court for further proceedings in light of this opinion.

---

**8.** The district court also expressed concerns about the possibility of a double recovery. We read the Boelkins testimony to be that the damages result from the presence of the mineral *lease* with Miller. As we affirm the court's decision denying the injunction against Miller, the plaintiffs have suffered damages that would continue even if the court were to enter an injunction against Paasche. In addition, we re-iterate the principle, discussed above, that Michigan law resolves doubts as to the amount of damages against the wrongdoer. *Lorenz,* 300 N.W.2d at 340. Nonetheless, we do recognize that equitable relief against Paasche could have some effect on the calculation of money damages, and our disposition of this case gives the district court latitude to take this into account.