**MORGANROTH & MORGANROTH, a Michigan partnership, and Mayer Morganroth, Plaintiffs–Appellees/ Cross–Appellants,**

v.

**John Z. DeLOREAN and Ecclesiastes 9:10–11–12, Inc., a Delaware Corporation (formerly known as Logan Manufacturing), a Delaware Corporation, jointly and severally, Defendants–Appellants/ Cross–Appellees.**

Nos. 95–1563, 95–1620.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 15, 1996.

Decided Aug. 14, 1997.

Order Denying Rehearing Oct. 14, 1997.

---

Edgar H. Boles (argued and briefed), Stephen G. Thomas (briefed), Thomas & Boles, Chagrin Falls, OH, for Defendants–Appellants/Cross–Appellees.

Mayer Morganroth (argued and briefed), Jeffrey B. Morganroth, Morganroth & Morganroth, Southfield, MI, Ellen R. Nadler and Robert N. Holtzman (briefed), Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, for Plaintiffs–Appellees/Cross–Appellants.

Before: MERRITT, COLE, and GODBOLD,* Circuit Judges.

MERRITT, Circuit Judge.

## OPINION

This case concerns a fee dispute between a lawyer and two of his former clients. Following a trial that lasted over three months, a jury awarded the lawyer over five million dollars in compensatory damages and five million dollars in punitive damages, but returned a verdict in favor of the former clients on the lawyer's RICO claim. The district court struck the punitive damages award on the ground that punitive damages are not allowed under Michigan law. The former clients appeal the compensatory and consequential damages award on a myriad of grounds discussed below. The lawyer cross-appeals the punitive damages issue. For the reasons set forth below, we AFFIRM the compensatory damages award, we AFFIRM the district court's alteration of the judgment to strike the punitive damages, and we AFFIRM the denial of the defendants' post-trial motion for Rule 11 sanctions on the plaintiffs' RICO claims.

## I

## FACTS

The plaintiffs, Mayer Morganroth and his law firm, Morganroth & Morganroth, represented the defendants, John DeLorean and Logan Manufacturing (which is now Ecclesiastes 9:10-11-12, Inc.), for a period of approximately ten and one half years during the 1980's and early 1990's. The scope of representation included a wide range of litigation and transactional matters, including criminal actions, divorce proceedings, bankruptcy and legal malpractice cases, tax matters, and various corporate transactions. During the course of much of this representation, DeLorean was the sole owner of Logan. Although DeLorean and Logan made a few partial payments to Morganroth for his services, Morganroth claims that they have

not paid him for the vast majority of his work. According to Morganroth, the defendants' assets were frozen due to a variety of lawsuits and restraining orders. Morganroth claims that he continued to represent the defendants despite not getting paid based on DeLorean's assurances that the defendants would pay him in full once their assets were unfrozen.

In January of 1993, DeLorean received $5,750,000 from the sale of Logan's assets. Rather than paying Morganroth, however, DeLorean filed a malpractice action against him in New York. That action has been dismissed and is unrelated to the current action. Shortly after DeLorean filed that suit, however, Morganroth brought this action seeking to recover his fees. Morganroth alleged RICO violations, fraud, breach of express contract, breach of implied contract, account stated, and unjust enrichment. The jury found for the defendants on the RICO claims, but found both DeLorean and Logan liable for fraud, breach of express contract, and account stated. Because it found that DeLorean and Logan had breached express contracts, the jury did not make any findings with respect to Morganroth's claims for breach of implied contract, quantum meruit, and unjust enrichment. The jury awarded the plaintiffs $4,739,894 in past due fees and expenses ($3,427,905 from DeLorean and $1,311,989 from Ecclesiastes) and $600,000 for lost business and income. In addition, the jury imposed $5,000,000 in punitive damages against DeLorean.

After the trial and verdict, the defendants filed motions seeking Rule 11 sanctions for Morganroth's RICO claims and asking the court to strike the punitive damages award. The district court denied the Rule 11 motion, but struck the punitive damages award based on Michigan law.

## II

## ANALYSIS

The parties have raised a myriad of issues on appeal. We will deal with each issue in turn.

---

* The Honorable John C. Godbold, Circuit Judge of the United States Court of Appeals for the Elev- enth Circuit, sitting by designation.

## A. Admission of Irrelevant "Bad Character" Evidence

The defendants claim that Morganroth's RICO cause of action was a sham claim. They argue that by including this claim, Morganroth was able to present evidence of DeLorean's bad character that was not relevant to any of Morganroth's other claims. The defendants argue that the district court erred by denying their motion to dismiss the RICO claim and their motion to try that claim separately. Because of these errors, they claim, Morganroth's "bad character" evidence unfairly prejudiced DeLorean's defense of the contract, fraud, and account stated claims. We need not review the district court's rulings on DeLorean's RICO motions, however. Instead, we find that, with one exception, the evidence about which DeLorean complains was either presented with no contemporaneous objection or was relevant to the non-RICO claims. The one exception is not sufficiently prejudicial to warrant a new trial.

### 1. *Failure to Pay Other Attorneys*

■ Morganroth presented evidence that DeLorean failed to pay a number of his prior attorneys. DeLorean now complains, in particular, about Thomas Kimmerly's testimony that DeLorean owed him three million dollars (R. 291 at 156) and Howard Weitzman's testimony that DeLorean owed him two million dollars (R. 289 at 128 & 141–44). At trial, however, DeLorean did not assert objections based on relevance, bad character evidence, or prejudice to this testimony or any of the other evidence that DeLorean did not pay other lawyers. DeLorean did object when his former wife Christina Thomopoulos, testified that he had not paid prior lawyers, but his objection was based only on the marital privilege. The court overruled that objection, and DeLorean did not make any objection to the substance of the testimony. By consistently failing to object to this evidence, DeLorean waived this claim.

■ Even if DeLorean had not waived this claim, evidence that DeLorean consistently failed to pay other lawyers was relevant to prove the element of intent to defraud in Morganroth's fraud claim. *See United*

States v. Ellzey, 874 F.2d 324, 329 (6th Cir. 1989); Fed.R.Evid. 404(b) ("Evidence of other ... wrongs ... may ... be admissible for ... proof of ... intent...."). DeLorean accurately cites *United States v. Jerkins,* 871 F.2d 598, 603–05 (6th Cir.1989) for the proposition that evidence of other wrongs is admissible under Rule 404(b) only if those wrongs were near in time and substantially similar to the actions at issue and the evidence is not unduly prejudicial. The evidence that DeLorean failed to pay other attorneys meets this test. *Jerkins* explicitly states that the other acts need not be identical to the act as issue. DeLorean's non-payment of other attorneys is not dissimilar to his nonpayment of Morganroth in any material way. With respect to nearness in time, the *Jerkins* court upheld admission of prior bad acts that had occurred six years before the activities at issue in that case. Under that standard, DeLorean's non-payment of attorneys whose representation of DeLorean overlapped with Morganroth's is clearly sufficiently near in time. Finally, the probative value of this evidence to demonstrate fraudulent intent, which is not easily susceptible of proof, far outweighs its minor prejudicial effect.

### 2. *Forging of Signatures and Documents*

■ DeLorean's ex-wife, Christina Thomopoulos, testified that she observed DeLorean practicing forging signatures, aging documents, handling documents with rubber gloves, and steaming open envelopes. She testified that she saw DeLorean practice the signatures of his business associates, Colin Chapman and Sir Kenneth Cork, and that on one occasion DeLorean gave her three documents that she knew were not authentic that bore forged signatures of Cork and Chapman. She testified that on one occasion DeLorean had her type up a phony transcript of a conversation that he had with Chapman. After DeLorean's arrest in 1987, Thomopoulos claims that he assigned all of his assets to her, but later told her he had destroyed that document. Thomopoulos also testified that she signed a one-page document on her wedding day relinquishing her rights to DeLorean's ranch in Pauma Valley. At the time of their divorce, she testified, DeLorean at-

tached a number of additional pages to this signature page purporting to relinquish many other rights. (R. 293 at 120–27; R. 255 at 6–7 & 25–28; R. 256 at 4–5).

At trial, DeLorean objected to much of this evidence on relevance grounds. The trial court, however, accepted Morganroth's argument that this evidence illustrated the difficulty and complexity of Morganroth's representation of DeLorean and refuted DeLorean's claim that Morganroth negligently failed to make diligent inquiry into factual matters related to Morganroth's representation of DeLorean (R. 293 at 40–44).

The trial court's admission of this evidence was correct. Morganroth represented DeLorean in his divorce from Thomopoulos. Evidence that DeLorean forged documents relating to the marriage is thus relevant to demonstrate the scope and nature of that representation, as well as to show the difficulties that DeLorean created for Morganroth within that representation. Those difficulties bolster Morganroth's proof of the amount of work that he performed for DeLorean. Morganroth's arguments as to the relevance of the remaining evidence of forgery and related illicit practices are also correct. DeLorean argued as a defense to Morganroth's fraud and contract claims that Morganroth's representation had been negligent in that he made unsupportable claims without adequate investigation of the underlying facts. Thomopoulos' testimony supports Morganroth's assertion that DeLorean impeded proper investigation by, among other things, forging documents. DeLorean now argues that he never alleged inadequate investigation with respect to the particular documents about which Thomopoulos testified. Nevertheless, DeLorean's allegations raised a general issue for the jury as to whether Morganroth should be denied full compensation due to incompetence. Morganroth was entitled, particularly in light of his quantum meruit claim, to show that his representation was competent and that he was impeded by DeLorean's own actions.

### 3. Ties to Organized Crime

■ DeLorean argues that Morganroth presented inadmissible evidence that he had ties to organized crime. To support this claim, DeLorean cites a list of sixty-one trial exhibits and a short passage from Morganroth's opening statement.

With one exception, DeLorean did not object to the admission of any of the exhibits he now claims should have been excluded (R. 201, Ex. B). In fact, DeLorean, himself, introduced eleven of the exhibits. The one objection that DeLorean did make, to Exhibits 953A, B, and C, was only on the grounds of lack of foundation. After the objection, a witness provided further testimony that established the foundation. DeLorean did not make any objection based on the substance of the document. By failing to make contemporaneous objections and introducing much of this material himself, DeLorean waived his claim that these exhibits were inadmissible.

■ In his opening statement, Morganroth stated that DeLorean attempted to obtain ten million dollars and a line of credit from organized crime in order to bail out DeLorean Motor Car, Limited (R. 287 at 94–95). This incident led directly to the cocaine charges against DeLorean that Morganroth helped defend. Details of the lawsuits in which Morganroth represented DeLorean were relevant to Morganroth's non-RICO claims to demonstrate the nature, amount, and complexity of work that Morganroth performed for DeLorean. Morganroth's statement was thus relevant, and did not create reversible error.

### 4. Purported Cancellation of the Logan Pension Plan

■ Morganroth represented DeLorean in negotiations to sell Logan or its assets that consummated in an asset sale in January of 1993. In connection with this sale, Morganroth negotiated the extent of DeLorean's liability for deficiencies in Logan's pension fund. (R. 292 at 162; R. 281 at 224). After the deal closed, however, DeLorean produced corporate minutes from 1988 purporting to show that he had canceled the pension plan at that time (R.281 at 221–25; R.292 at 161–63 & 222–24).

DeLorean objected to this evidence at trial on relevance grounds. The court, however,

overruled the objection based on Morganroth's arguments that this incident demonstrated the difficulty involved in representing DeLorean. That ruling was correct. DeLorean's failure to disclose crucial information to Morganroth substantially increased the amount of work Morganroth was required to perform and was relevant to support Morganroth's proof of the amount of time he billed.

[7] DeLorean argues that he had not, in fact, canceled the pension plan. He argues that his representations that he had canceled it were false. Since he made those representations after Morganroth's representation of him had ended, he claims they are not relevant to Morganroth's fee claims. This position, however, is inconsistent with DeLorean's testimony at trial that he had canceled the pension plan in 1988 (R. 281 at 221–25). The district court's ruling was clearly correct on the facts to which DeLorean testified. A party cannot testify one way at trial and then reverse his or her factual contentions on appeal in order to overcome an adverse evidentiary ruling.

### 5. *Money Laundering*

■ DeLorean complains that during Morganroth's opening statement, Morganroth accused DeLorean of money laundering (R. 287 at 89–90). Morganroth, however, was describing actions by DeLorean that formed the basis for a later claim in bankruptcy proceedings in which Morganroth represented DeLorean. In particular, DeLorean created a limited partnership purportedly to raise money to pay GPD for performing the engineering work to create a prototype DeLorean automobile. DeLorean, however, skimmed off half of the money that was raised, laundered it, and used it to pay off Logan loans. Later, Morganroth represented DeLorean in a suit by the limited partners seeking to recoup those funds. Morganroth's statements were thus descriptive of one of the matters in which he represented DeLorean, and were relevant to show the nature, complexity, and amount of work required by that representation. Moreover, in response to an objection by DeLorean, the court instructed the jury that Morganroth's

statements were not evidence and that they would have to decide the case based on evidence actually admitted during the trial (R. 287 at 90).

### 6. *Statement About Hillel Levin*

DeLorean's ex-wife, Christina Thomopoulos, testified that DeLorean said, "Wouldn't it be interesting if [Hillel Levin] was caught with some cocaine and he got set up just like I got set up." (R.256 at 3). At trial, DeLorean objected to this statement solely on the grounds of the marital privilege. He did not object to the relevance or prejudicial effect of the testimony, and thus waived such objections. The marital privilege issue is discussed in section II.C below.

### 7. *Relationship With Roy Nesseth*

■ DeLorean objects to evidence that he associated with Roy Nesseth and that Nesseth was a convicted felon. Morganroth introduced evidence, however, that Logan was subject to court orders and covenants with banks barring it from making payments to associates of DeLorean (R. 292 at 163–66). Nevertheless, and despite at one time agreeing with attorney Richard Berger that Nesseth was DeLorean's associate (R. 292 at 161–63), DeLorean made Nesseth Vice Chairman of Logan (R. 292 at 154) and directed that he continue to be paid despite the orders and covenants (R. 292 at 164–67). Subsequently, Morganroth represented DeLorean in contempt proceeding based on those actions. Evidence of DeLorean's relationship with Nesseth was thus relevant to demonstrate the nature and extent of Morganroth's representation of DeLorean.

DeLorean did not object contemporaneously to testimony that Nesseth was a convicted felon and thus waived that objection. At trial, after Howard Weitzman testified that he told DeLorean that he did not want Nesseth around his office, Morganroth asked Weitzman what he told DeLorean. DeLorean objected solely on the basis of the attorney-client privilege. After the court overruled that objection (which is discussed below in section II.B), Weitzman testified that (i) Nesseth had been convicted of forgery and grand theft; (ii) Nesseth "fronted" a lot of

things for DeLorean; (iii) Weitzman thought Nesseth would taint DeLorean's image in any jury trials; and (iv) Weitzman did not like Nesseth. Although this response went beyond the scope of the question, DeLorean did not make any further objection. He thus waived the objection he now attempts to make.

Michael Beeley, Logan's former president, testified that Nesseth engaged in behavior that was "very close" to unethical or illegal (R. 292 at 154–57). DeLorean did not object to this testimony at trial. Beeley also described a transaction in which he gave checks to Nesseth at DeLorean's behest and learned later that they were not used for the transaction for which DeLorean and Nesseth told him they would be used (R. 292 at 154–57). Although DeLorean objected to that testimony, the objection was based solely on hearsay grounds. DeLorean thus waived his objection to the substantive content of the testimony.

### 8. Appropriation of Logan Profits

■ Logan vice president Melvin Mitchell testified that DeLorean took all of Logan's profits in 1982. DeLorean objected to this testimony at trial on relevance grounds. The testimony was not directly relevant to Morganroth's claims, since Morganroth did not represent DeLorean in 1982. Nevertheless, the trial court allowed the testimony as relevant to rebut DeLorean's claim that he loaned money to Logan during that time. We affirm that ruling.

### 9. Failure to Repay Robin Bailey or Robin Bascheer Loan

■ Attorney Thomas Kimmerly testified that DeLorean induced an attorney who is referred to in the record as either Robin Bailey or Robin Bascheer to loan DeLorean $75,000 taken out of other clients' funds. DeLorean did not repay this loan (R. 288 at 22–31). The trial court admitted this testimony over DeLorean's objections because it was relevant to Morganroth's RICO cause of action. Although that ruling was correct, this testimony was not relevant to any of Morganroth's non-RICO claims. Failure to repay a loan is not sufficiently similar to

failure to pay an attorney for services rendered to be relevant to prove fraudulent intent. This testimony, then, was improper if DeLorean is correct that it was error for the district court not to dismiss or separate the RICO cause of action. We need not decide the RICO issue, however. Even if this testimony should not have been admitted, it was not sufficiently prejudicial to warrant reversal.

■ Reversal based on improper admission of evidence is appropriate only when the admission interfered with substantial justice. *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 550 (6th Cir.1981); Fed.R.Civ.P. 61 ("No error in ... the admission ... of evidence ... is ground for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); Fed.R.Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...."). Any prejudice caused by admission of the evidence regarding Bailey or Bascheer was slight. In light of the compelling evidence supporting Morganroth's case, *see* Section II.D, *infra*, admission of this evidence was harmless and does not warrant reversal. *See City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir.1980).

### B. Admission of Testimony Protected by the Attorney–Client Privilege

DeLorean asserts that he was prejudiced by the improper admission of evidence protected by the attorney-client privilege. Review of the testimony that DeLorean cites on this point, however, reveals that almost all of that testimony was elicited without any attorney-client privilege objection. Our review of DeLorean's citations, as well as independent review of the trial record, reveals only three instances in which the court admitted testimony against DeLorean over an attorney-client privilege objection. In each of these instances, DeLorean's objections were not

well-founded, and the trial court did not err in allowing the testimony.

■ In the first instance, former DeLorean attorney Howard Weitzman testified as to what DeLorean had said he thought the attorney's fees would be in an action at the start of that action (R.289 at 120). The district court overruled DeLorean's attorney-client privilege objection on the ground that this was a non-privileged, financial discussion that did not involve the seeking or provision of legal advice. That ruling was correct. Moreover, even if it were incorrect, this evidence was not prejudicial.

■ Weitzman also testified that DeLorean told him that DeLorean was responsible for Weitzman becoming better known and achieving a greater profile. The district court correctly found that this conversation was also not related to seeking or providing legal advice and was thus not privileged. This evidence, too, was not prejudicial.

■ Weitzman also testified that he told DeLorean he did not want Nesseth around his (Weitzman's) office because of Nesseth's forgery and grand theft convictions and because Weitzman did not like him. The trial court ruled that this, too, was not related to legal advice or representation. That ruling was also correct. When he made this statement, Weitzman was not providing DeLorean legal advice about Nesseth. He was merely stating his personal opinion about him in the context of explaining why he did not want to have any dealings with him.

### C. Admission of Testimony Protected by the Marital Privilege

■ DeLorean complains that much of Christina Thomopoulos' testimony, set forth in section II.A.2 above, violated the marital privilege. DeLorean made contemporaneous objections at trial to much of this testimony. Thomopoulos, however, was unavailable at trial and did not testify live. Rather, Morganroth read portions of her testimony to the jury. Although DeLorean purportedly made a general continuing objection at the deposition to all marital conversations, he did not make specific objections on that basis to the testimony about

which he now complains (R. 255 at 14–17). The trial judge ruled that DeLorean waived the privilege by not objecting when Thomopoulos provided this testimony at her deposition. That ruling was correct. *See People v. Whalen,* 129 Mich.App. 732, 342 N.W.2d 917, 919 (1984) ("if the spouse testified at the preliminary examination ... and the marital privilege was *not* properly asserted, the preliminary examination testimony is admissible at trial when the marital privilege is asserted by the defendant."). As the trial judge correctly held, the person asserting the marital privilege has the burden of proving that a communication is a marital communication. Thomopoulos' testimony did not establish whether the communications at issue were private marital communications or were made in the presence of others. As the district court correctly found, DeLorean's failure to lodge a specific objection at the deposition deprived Morganroth of the opportunity to question Thomopoulos further regarding the context of these communications.

### D. Sufficiency of the Evidence

■ DeLorean argues that the jury's express contract, fraud, and account stated verdicts were "contrary to the manifest weight of the evidence." DeLorean has waived these claims, however, by failing to raise them below in a timely motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2536 (1995) and cases cited therein. As the advisory committee notes to Rule 50's 1991 amendments explain, "[t]he purpose of this requirement is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment." DeLorean's post-trial motion to set aside the account stated verdict on the ground that the damages award was inconsistent with the account stated proof could be construed as motion for judgment as a matter of law. Such a construction would be unavailing to DeLorean, however, as the motion was filed after the jury verdict and was thus not timely. DeLorean failed to call the alleged failures in

Morganroth's proof to the trial court's attention in a timely fashion. He cannot now complain of those alleged failures.

 Even if DeLorean had filed a timely motion, however, Morganroth presented overwhelming evidence to the jury that was clearly sufficient to warrant its findings. With respect to the breach of contract claim, for example, DeLorean stipulated the existence of an express contract (R. 187). From DeLorean's own testimony, a reasonable juror could conclude that DeLorean did not dispute Morganroth's claims regarding the number of hours that he worked and his hourly fee, but claimed only that he should not have to pay the entire fee due to Morganroth's alleged malpractice (R. 281 at 236–43). In addition, Morganroth presented extensive evidence supporting his claims regarding the number of hours that he worked as well as bills that he had sent to DeLorean and testimony that DeLorean had approved those bills. This evidence was further supported by DeLorean and Logan financial statements reflecting amounts owed to Morganroth consistent with his claims. The jury's compensatory damage award was in line with this evidence.

Although we also find no merit in DeLorean's legal arguments regarding the sufficiency of the evidence with respect to Morganroth's fraud and account stated claims, we need not address those arguments in detail in light of our finding that DeLorean waived those claims.

## E. Rule 11 Sanctions

 Following the jury verdict, DeLorean moved for sanctions pursuant to Fed. R.Civ.P. Rule 11 on the ground that Morganroth's RICO cause of action was frivolous. The district court denied the motion. We need not consider the merits of DeLorean's claim for sanctions, because he did not file it in a timely fashion in accordance with Rule 11's safe harbor provision.

Rule 11(c)(1)(A) provides: "A motion for sanctions under this rule .... shall not be filed with or presented to the court unless, within 21 days after service of the motion ... the challenged ... claim ... is not withdrawn or appropriately corrected." The 1993 advisory committee notes clarify that "[g]iven the 'safe harbor' provisions [of subsection (c)(1)(A) ], a party cannot delay serving its Rule 11 motion until conclusion of the case...." This is clearly in keeping with the objective of the safe harbor provision to provide a party with the opportunity to withdraw a frivolous claim prior to the imposition of sanctions.

DeLorean argues that Rule 11 sanctions are warranted in this case despite Rule 11's safe harbor provision because a RICO suit against a former client is so clearly frivolous that any attorney filing such a suit should anticipate Rule 11 sanctions. In addition to its questionable premise, DeLorean's argument demonstrates a failure to understand the purpose of the safe-harbor provision. *Any* claim subject to Rule 11 sanctions is so frivolous that a lawyer should know better than to file it. The safe harbor provision nevertheless requires opposing counsel to put the filing lawyer on notice that he or she may be sanctioned and to give the filing lawyer an opportunity to reconsider. Rule 11 does not distinguish degrees of frivolity. We find that there is no reason why RICO claims should be given less solicitude under Rule 11 or why RICO claims against attorneys' former clients are inherently more obviously subject to Rule 11 sanctions than any other claims.

## F. Damages for Lost Business and Income

 DeLorean argues that the jury award of $600,000 to Morganroth for lost business and income was "against the manifest weight of the evidence and is contrary to law." DeLorean does not argue merely that the jury miscalculated the amount of consequential damages to which Morganroth was entitled. Rather, he argues that Morganroth was not entitled to any consequential damages because the losses Morganroth claimed are not compensable lost business and income damages as a matter of law. As such, DeLorean's argument is one of insufficiency of the evidence. DeLorean failed to raise this issue in a timely motion for judgment as a matter of law and has thus waived this claim for the reasons set forth in Section II.D above.

The plain error doctrine does not salvage this issue. Unlike punitive damages, discussed below in Section II.H, consequential damages are available in breach of contract

claims under Michigan law. *See, e.g., Lawrence v. Will Darrah & Assocs., Inc.,* 445 Mich. 1, 516 N.W.2d 43 (1994). Thus submission of this issue to the jury, without any objection by DeLorean, was not plain error. Reversing now on the ground that Morganroth's evidence was not sufficient to warrant consequential damages would deprive Morganroth of the opportunity to put on evidence to remedy the alleged insufficiency, contrary to the advisory committee's admonition discussed in Section II.D above.

## G. Statute of Limitations

█ DeLorean asserts that Morganroth's recovery should have been limited to damages suffered subsequent to February 25, 1987, due to Michigan's six-year statute of limitations on Morganroth's state law claims. DeLorean pled the statute of limitations as a defense in his answer and in the pre-trial order, but he did not make any substantive motions on this basis and he failed to include this defense in the jury instructions or to argue it to the jury. DeLorean acknowledges that he thus waived this issue. He argues, however, that allowing damages prior to February 25, 1987 constituted plain error.

For his part, Morganroth argues that the statute of limitations was either tolled or is not available as a defense because (i) DeLorean and Logan fraudulently concealed the existence of a claim, *see* Mich. Comp. Laws § 600.5855; (ii) DeLorean and Logan made false representations or concealments with the expectation that Morganroth would rely on them, *see Lothian v. City of Detroit,* 414 Mich. 160, 324 N.W.2d 9, 17–18 (1982); (iii) DeLorean and Logan acknowledged their past obligations in signed writings, *see In re Easterbrook Estate,* 114 Mich.App. 739, 319 N.W.2d 655, 659 (1982); Mich. Comp. Laws § 600.5866; and (iv) DeLorean and Logan voluntarily made payments to Morganroth, *see Beaupre v. Holzbaugh,* 327 Mich. 101, 41 N.W.2d 338, 341 (1950). These arguments are sufficiently weighty that the district court's failure to dismiss this action based on the statute of limitations was not plain error.

## H. Punitive Damages

The jury awarded Morganroth five million dollars in punitive damages. Following the trial, however, the district court granted DeLorean's motion to amend the judgment to strike the punitive damages on the ground that "punitive" damages—as distinguished from "exemplary" damages—are not available under Michigan law. Morganroth does not argue that Michigan law allows punitive damages. Instead, he argues (i) that DeLorean was estopped from raising this argument because he requested the jury instruction regarding punitive damages; and (ii) that punitive damages are allowed under either federal law or New Jersey law.

█ Michigan law allows exemplary damages, but only to compensate the plaintiff "for the humiliation, sense of outrage, and indignity resulting from injuries maliciously, willfully and wantonly inflicted by the defendant." *Kewin v. Massachusetts Mut. Life Ins. Co.,* 409 Mich. 401, 295 N.W.2d 50, 55 (1980) (internal quotation marks omitted). Under Michigan law, exemplary damages are merely one category of compensatory damages. *Veselenak v. Smith,* 414 Mich. 567, 327 N.W.2d 261, 264 (1982). Michigan does not allow juries to award damages going beyond compensatory damages in order to punish the defendant. *Kewin,* 295 N.W.2d at 55; *Hayes–Albion v. Kuberski,* 421 Mich. 170, 364 N.W.2d 609, 617 (1985).

The jury instructions in this case mentioned both exemplary and punitive damages, but defined only punitive damages. The jury received the following instruction:

*Punitive Damages.* You may also decide whether the plaintiffs are entitled to the award of any punitive damages for the fraud alleged. The function of punitive damages is to punish he defendant for malicious conduct and to deter similar conduct by others. Whether you decide to award any punitive damages should be based on whether you find that the defendants acted wilfully, deliberately, maliciously, or with reckless disregard of the plaintiff's rights. If you find that they have done one of those things, then you may award punitive damages.

Punitive damages may be awarded even if the violation of plaintiff's rights resulted in only nominal compensatory damages. That is, even if the plaintiff can show no damages or other injury as a result of the defendant's actions, if these actions were deliberate, willful or made with reckless

disregard of plaintiffs [sic] rights, punitive damages are appropriate.

(R. 201, Ex. L). Based on this instruction, the jury's punitive damages award could only have been made to punish DeLorean, and not as compensation for any humiliation, sense of outrage, or indignity that Morganroth may have suffered. This instruction was thus clearly improper under Michigan law.

■ In *Thompson v. Paasche*, 950 F.2d 306 (6th Cir.1991), we held that the award of punitive damages constitutes plain error under Michigan law when actual damages are sufficient to make the plaintiff whole. Such an award requires reversal, even if the defendant failed to object to the punitive damages jury instruction. *Id.* at 314–15. *Thompson* is on all fours with this case, and requires us to affirm the district court's striking of the punitive damages award.

■ Morganroth attempts to distinguish this case from *Thompson* by arguing that DeLorean not only failed to object, but affirmatively "requested, approved, and stipulated to" the punitive damages jury instruction. The record does not support Morganroth's this contention. The only mention in the record of the source of the original jury instructions is the trial judge's statement prior to hearing objections on the instructions that "[t]he Court has this morning presented the instructions *it proposes* to Counsel ..." (R. 276 at 3) (emphasis added). The record does not contain proposed jury instructions from either party. Thus we cannot conclude that DeLorean requested the initial punitive damages instructions.

Morganroth's argument is apparently based on a supplemental instruction that the court gave in response to a question that the jury asked after it began deliberating. Examination of the transcript, however, reveals that Morganroth, not DeLorean, proposed the substantive content of that supplemental instruction. Apparently because the original jury instructions mentioned both punitive and exemplary damages, but defined only punitive damages, the jury submitted the question "Are punitive damages the same as exemplary damages?" (R. 266 at 2). The trial judge initially proposed the response "punitive are the same as exemplary for purposes of this case," but DeLorean objected on the ground that punitive damages and exemplary damages are different under

Michigan law. *Id.* In response, Morganroth stated that he was not seeking exemplary damages (R. 266 at 3) and proposed that the court respond that "only punitive damages are sought in this case." (R. 266 at 5). The court adopted that response. Thus, Morganroth, not DeLorean, proposed the supplemental jury instruction and invited the court to make the error in question. The error in failing to properly instruct may not be attributed to DeLorean, and the district court properly corrected its error by setting aside the punitive damages.

■ Morganroth argues that he is entitled to punitive damages under federal law because DeLorean's fraud against him violated the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343. Violations of these sections of the federal criminal code, however, do not give rise to private causes of action. *Ryan v. Ohio Edison Co.*, 611 F.2d 1170, 1177–79 (6th Cir.1979); *Napper v. Anderson, Henley, Shields, Bradford & Pritchard*, 500 F.2d 634, 636 (5th Cir.1974). Since no damages can be obtained in an action brought directly under these statutes, they cannot be used to bootstrap punitive damages into an action for fraud brought under state law.

■ Morganroth also argues that the district court should have allowed punitive damages under the law of New Jersey, where DeLorean resides. Morganroth argues that under the interest analysis approach, New Jersey's "interest in deterring its citizens from committing fraud and violating the federal mail and wire fraud statutes ...." is determinative. Morganroth raised this argument for the first time after trial in response to DeLorean's motion to strike the punitive damages. Throughout the trial of this case, the parties and the district court never questioned that Morganroth's non-RICO claims were governed by Michigan law. Morganroth's offices are located in Michigan. Although his representation of DeLorean caused him to travel outside of Michigan on occasion, he performed the majority of his work for DeLorean at his Michigan offices. Our review of the record indicates that the incidents and contacts giving rise to this suit occurred mostly in Michigan. In light of that conclusion and the general assumption, maintained until the jury returned its verdict, that Michigan law governed this case, we find that the district court did not err when it

declined to apply New Jersey law to the punitive damages issue.

## III

## CONCLUSION

Based on the above analysis, we AFFIRM all of the rulings challenged in this appeal.

### ORDER DENYING PETITION FOR REHEARING

Oct. 14, 1997

Upon consideration of the petition for rehearing filed herein by the defendants-appellants, the Court concludes that all of the questions addressed in the petition for rehearing were fully considered upon the original submission and decision of this case.

In their petition for rehearing, defendants argue that our panel incorrectly decided that they waived their right to appeal the sufficiency of the evidence on the claims for breach of express contract, fraud, account stated, and the request for lost business and income damages because defendants had failed to make a timely motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). Although defendants claim that the District Court refused to allow them to present Rule 50(a) motions, defendants' selective quotes from the District Court's statements are misleading. The District Court only prevented defendants from making oral argument on the two already filed Rule 50(a) motions. One motion addressed the RICO claim and the other motion addressed the claims for breach of implied contract, quantum meruit, and unjust enrichment. There is nothing in the record to suggest that the District Court prevented them from filing other motions. In addition, our opinion explicitly held that even if defendants had filed timely Rule 50(a) motions for the claims of breach of express contract, fraud, and account stated, the record showed sufficient evidence to support these claims.

It is therefore ORDERED that the petition for rehearing be and it hereby is denied.