KELLY-STEHNEY & ASSOCIATES, INC v MACDONALD'S
INDUSTRIAL PRODUCTS, INC (ON REMAND)

Docket No. 238079. Submitted May 21, 2004, at Lansing. Decided
February 3, 2005, at 9:05 a.m.

Kelly-Stehney & Associates, Inc., brought an action in the Oakland
Circuit Court against MacDonald's Industrial Products, Inc., seek-
ing damages for commissions allegedly due the plaintiff under a
written agreement between the parties. The agreement provided
that all modifications must be in writing. The defendant, however,
subsequently reduced the commissions paid for certain products
pursuant to an oral agreement between the defendant's president
and one of the plaintiff's main shareholders. The trial court, Rae
Lee Chabot, J., granted summary disposition for the defendant on
the bases that the oral agreement was not barred by the statute of
frauds, the parties were bound by the oral agreement, and the
plaintiff was equitably estopped from denying the oral agreement.
The Court of Appeals, BANDSTRA, P.J., and ZAHRA and METER, JJ.,
affirmed the trial court's decision, concluding that it was con-
strained by precedent to hold that the statute of frauds did not
apply to the oral agreement because the plaintiff was equitably
estopped from denying the oral agreement's validity. 254 Mich App
608 (2002). The Supreme Court vacated the judgment of the Court
of Appeals and remanded the case to that Court with instructions
to remand the case to the trial court. 469 Mich 1046 (2004). On
remand, the trial court, Colleen A. O'Brien, J., determined that
various checks, reports, and correspondence between the parties
were writings sufficient to satisfy the statute of frauds, that MCL
566.136 buttressed that conclusion, and that there was clear and
convincing evidence that the plaintiff waived the provision of the
written agreement requiring written modification and agreed to
the oral modification.

On remand, the Court of Appeals *held*:

1. The oral agreement is not barred by the statute of frauds
because the commission checks, commission reports, and corre-
spondence between the parties had substantial probative value to
establish the oral agreement and were writings sufficient to satisfy
the statute of frauds. The statute of frauds does not require that

the entire agreement be in writing, but only requires a note or memorandum having substantial probative value in establishing the contract. A sufficient note or memorandum may be in a variety of forms and may consist of more than one document made at different times. The writing need not contain every detail of the agreement to satisfy the statute of frauds and extrinsic evidence may be used to supplement, but not contradict, the terms of the written agreement.

2. The statute of frauds in MCL 566.132(1)(a) must be read in conjunction with MCL 566.136. The lack of expressed consideration in the writings does not affect whether there is a writing sufficient to satisfy the statute of frauds.

3. There is clear and convincing evidence that the plaintiff waived the provision of the written agreement requiring written modifications and assented to payment of lower commissions under the oral agreement. The plaintiff accepted the reduced commission checks by signing and cashing them and also signed the commission reports. The plaintiff's acceptance is further evidenced by a letter to the defendant and testimony by the plaintiff's main shareholder.

Affirmed.

1. STATUTE OF FRAUDS — SUFFICIENCY OF WRITING.

The statute of frauds does not require that the entire agreement be in writing, but only requires a note or memorandum having substantial probative value in establishing the contract; a sufficient note or memorandum may be in a variety of forms and may consist of more than one document made at different times (MCL 566.132).

2. STATUTE OF FRAUDS — EXTRINSIC EVIDENCE.

A writing that satisfies the statute of frauds need not contain every detail of the agreement and extrinsic evidence may be used to supplement, but not contradict, the terms of the written agreement.

*Colombo and Colombo, P.C.* (by *Michael J. O'Shaughnessy* and *Eric R. Bowden*), for the plaintiff.

*Miller, Johnson, Snell & Cummiskey, P.L.C.* (by *David J. Gass* and *S. Grace Davis*), for the defendant.

Before: BANDSTRA, P.J., and ZAHRA and METER, JJ.

ZAHRA, J. In February 1994, the parties entered into a written manufacturer's representative agreement (MRA) by which plaintiff would receive three percent commissions on its sales of products manufactured by defendant for three years, thereafter extending in one-year increments, unless otherwise agreed in writing. In early 1997, defendant orally proposed to extend the contract for another three years on the condition that plaintiff's commissions on certain products would decrease on a sliding scale. Pursuant to this oral agreement (the DLO agreement), defendant paid plaintiff decreased commissions over the next three years. After defendant terminated the contract in 2000, plaintiff sued defendant, arguing that it should have received three percent commissions under the MRA.

This is the second time the parties have appeared in this Court. Initially, we reluctantly affirmed an order granting summary disposition for defendant premised on an equitable estoppel theory. We were reluctant in our affirmance because the concept of equitable estoppel is inconsistent with the purpose of the statute of frauds, which would bar an oral agreement under these circumstances. Still, we were constrained by existing Supreme Court precedents. This matter was subsequently remanded to this Court by the Supreme Court, 469 Mich 1046 (2004), with directions that we remand the case to the trial court for consideration of the following issues:

> (1) whether there is a writing here sufficient to satisfy the statute of frauds, MCL 566.132(1); *Goslin v Goslin*, 369 Mich 372, 376 [120 NW2d 242] (1963); (2) whether *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 364 [666 NW2d 251] (2003), is pertinent to this case; and (3) whether the language of MCL 566.136 affects the disposition of this case or the resolution of whether there is a sufficient writing.

The trial court determined that the commission checks, commission reports, and correspondence between the parties were writings sufficient to satisfy the statute of frauds, MCL 566.132(1). The trial court observed that MCL 566.136 buttresses the conclusion that the writings satisfy the statute of frauds. Further, the trial court concluded that there is clear and convincing evidence that plaintiff, through writings, oral representations, and conduct, waived the written modification clause of the MRA and agreed to modify the MRA by entering into the DLO agreement.

We agree with the trial court and affirm the order granting summary disposition in favor of defendant.

## I. FACTS AND PROCEDURE

The pertinent facts were previously set forth by this Court in *Kelly-Stehney & Assoc, Inc v MacDonald's Industrial Products, Inc*, 254 Mich App 608, 609-611; 658 NW2d 494 (2003), vacated and remanded 469 Mich 1046 (2004):

On February 23, 1994, the parties entered into a Manufacturer's Representative Agreement (MRA), which provided that plaintiff would work for defendant as an independent contractor selling products manufactured by defendant to other manufacturers in the automotive industry. The MRA provided that plaintiff would receive three percent commissions on new product sales of defendant's products unless otherwise agreed in writing. The MRA bound both parties for three years and automatically extended in one-year increments after the initial three years. The MRA further provided that all modifications had to be in writing.

After the parties entered into the MRA, defendant made an agreement with DaimlerChrysler Corporation in which defendant was scheduled, commencing in the summer of 1997, to produce a line of automotive window frames called

the Daylight Opening (DLO). In early 1997, defendant's president, Robert MacDonald, orally proposed a three-year special arrangement regarding the DLO program to Edward Stehney, one of plaintiff's main shareholders (the oral DLO agreement). MacDonald proposed that defendant would extend the MRA, but would pay plaintiff DLO commissions on a reduced sliding scale as follows: three percent for model year (MY) 1998,[1] two percent for MY 1999, and 1.5 percent for MY 2000. Under this agreement, defendant would pay plaintiff commissions based on a fixed rate of $21.86 for each piece.[2] MacDonald testified that Stehney orally agreed to this arrangement. MacDonald attested that the only reason he agreed to extend the term of the MRA was because plaintiff agreed to continue working for reduced commissions under the oral DLO agreement.

In MYs 1998 through 2000, defendant paid plaintiff commissions based on $21.86 for each piece. Defendant paid plaintiff three percent commissions in MY 1998, two percent in MY 1999, and 1.5 percent in MY 2000. Defendant terminated the MRA on January 7, 2000. After this termination, plaintiff demanded that defendant pay plaintiff its commissions for MYs 1999 and 2000 at a rate of three percent. When defendant refused, plaintiff sued, requesting damages based on the commissions to which it was originally entitled under the MRA. The trial court granted defendant's motion for summary disposition, concluding that the oral DLO agreement was not barred by the statute of frauds and the parties were bound by this agreement. The trial court further concluded that plaintiff's claims were barred by equitable estoppel.

---

[1] A "model year" spanned from July through June of the next year.

[2] Apparently, instead of paying plaintiff commissions based on the varying prices of the products, defendant proposed paying the commissions at a fixed rate of $21.86 for each piece. Defendant apparently determined this

amount by factoring in the material costs for each piece, labor costs, burden costs, and scrap costs of each operation used in making the pieces.

---

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision whether to grant a motion for summary disposition. *Corley v Detroit Bd of Ed*, 470 Mich 274, 277; 681 NW2d 342 (2004). Similarly, "[t]his Court reviews de novo questions of law such as whether the statute of frauds bars enforcement of a purported contract." *Zander v Ogihara Corp*, 213 Mich App 438, 441; 540 NW2d 702 (1995).

> "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." [*Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999).] In evaluating such a motion, a court considers the entire record in the light most favorable to the party opposing the motion, including affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Corley, supra* at 278.]

### B. DISCUSSION

### 1. STATUTE OF FRAUDS

Plaintiff first argues that the DLO agreement is barred by the statute of frauds because there was not a writing sufficient to satisfy the statute. The applicable statute of frauds provides, in pertinent part:

> In the following cases an agreement, contract, or promise is void unless that agreement, contract, or promise, or a

note or memorandum of the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with the agreement, contract, or promise:

(a) An agreement that, by its terms, is not to be performed within 1 year from the making of the agreement. [MCL 566.132(1).]

Here, there is no dispute that the DLO agreement was for a term of three years, so it could not be performed in full within one year from the making of the agreement. Therefore, the DLO agreement is void under the statute of frauds unless it was in writing and signed by plaintiff.

Our Supreme Court has declined to adopt narrow and rigid rules for compliance with the statute of frauds. *Opdyke Investment Co v Norris Grain Co*, 413 Mich 354, 367; 320 NW2d 836 (1982) Instead, the Court has adopted a case-by-case approach. *Forge v Smith*, 458 Mich 198, 206; 580 NW2d 876 (1998). The statute of frauds does not require that the entire agreement be in writing, but only requires that "a note or memorandum of the agreement" is in writing and signed. MCL 566.132(1); *Opdyke, supra* at 367. Our Supreme Court, in *Goslin v Goslin*, 369 Mich 372, 376; 120 NW2d 242 (1963), adopted Professor Corbin's standard for what constitutes a sufficient note or memorandum under the statute of frauds. Our Supreme Court reaffirmed this standard in *Opdyke, supra* at 368, quoting *Goslin, supra* at 376, quoting an earlier edition of 2 Corbin, Contracts, § 498, p 683:

" 'Let us proceed, therefore, with a general consideration of what constitutes a sufficient note or memorandum. We may well start with this one general doctrine: There are few, if any, specific and uniform requirements. The statute itself prescribes none; and a study of the existing thousands of cases does not justify us in asserting their existence. Some note or memorandum having substantial pro-

bative value in establishing the contract must exist; but its sufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found. * * * That is the rule of law to be applied with intelligence and discrimination and not like a pedant playing a game of logomachy.' "[1]

---

[1] Plaintiff argues that the law has developed since *Goslin* to require that a writing must be certain and definite in regard to its "essential terms" in order to satisfy the statute of frauds. The trial court rejected this argument, citing *Zurcher v Herveat*, 238 Mich App 267, 279; 605 NW2d 329 (1999). In *Opdyke, supra* at 369, our Supreme Court seemed to hold that the statute of frauds requires that the "essential terms" of the contract be in writing. Specifically, the Court held that the statute of frauds at issue, MCL 566.108, did not require the precise construction site to be included in the writing, because the parties did not regard the precise construction site to be an essential term of the agreement and only " 'essential' terms" need be reduced to writing. However, the Court then proceeded to rely on the " 'substantial probative value' " test set forth in *Goslin* in determining that the writing satisfied the statute of frauds. *Opdyke, supra* at 369. Since *Opdyke*, this Court has suggested several times that the statute of frauds requires the "essential terms" of the contract to be reduced to writing. See, e.g., *McFadden v Imus*, 192 Mich App 629, 633; 481 NW2d 812 (1992) (in which this Court stated that the applicable statute of frauds, MCL 566.106, required a writing transferring an interest in land to be certain and definite with regard to the parties, property, consideration, premises, and time of performance, and that the signature of the party to be charged was an "essential term" of the writing), *Kojaian v Ernst*, 177 Mich App 727, 730; 442 NW2d 286 (1989) (in which this Court stated that in order to satisfy the statute of frauds, all essential terms of an agreement to sell real estate must be in writing and signed by the party to be charged with the agreement), and *Smith v City of Pontiac*, 169 Mich App 559, 562; 426 NW2d 704 (1988) (in which this Court held that under the applicable statute of frauds, former MCL 566.132(g), the absence of a writing containing the essential terms of the alleged contract was fatal to the plaintiff's contract claim regarding medical treatment). But more recently, in *Zurcher, supra* at 279, this Court explained that there is a distinction between the substance of a contract and the form of a contract: "The *substance* of a binding contract for the sale of land is a subject separate from its sufficiency under the statute of frauds and one that is governed by the general contract law concept that there must be a meeting of the minds regarding the 'essential particulars' of the transaction." (Emphasis in original.) After explaining this distinction, however, the *Zurcher* panel went on to point

A note or memorandum may be sufficient under the statute of frauds in any number of forms, including a letter, an account statement, a draft or note, or a check. 10 Williston, Contracts (4th ed), § 29.21, pp 577-581; see, e.g., *Adell Broadcasting Corp v Cablevision Industries*, 854 F Supp 1280, 1282, 1291 (ED Mich, 1994) (the federal district court, applying *Opdyke, supra* at 367-368, and *Goslin, supra* at 376, noted that a check endorsed by the defendant and merely stating "Cable Equipment" was enough to show that there was at least an agreement between the parties and was sufficient to satisfy the writing requirement of the statute of frauds). Plaintiff argues that the writing requirement of the statute of frauds "must be satisfied at a single point in time, not over the course of three years . . . ." However, "[a] 'note or memorandum' may be sufficient to satisfy the requirements of the statute of frauds even though it consists of several separate papers and documents, not all of which are signed by the party to be charged, and none of which is a sufficient memorandum in itself." 4 Corbin, Contracts (rev ed), § 23.3, p 771. "It

out that this Court has on occasion "conflated form questions under the statute of frauds with substance questions under general contract law principles." *Id.* at 280.

Here, plaintiff argues that the writing requirement of the statute of frauds was not satisfied because several essential terms of the DLO agreement were not reduced to writing. Plaintiff makes a persuasive argument that the length of the contract was an essential term of the DLO agreement that was not included in the writings. However, given that our Supreme Court specifically directed us to follow *Goslin* in determining whether there is a writing to satisfy the statute of frauds, we will apply the *Goslin* test, which requires the writing to have " 'substantial probative value in establishing the contract . . . .' " *Goslin, supra* at 376, quoting an earlier edition of 2 Corbin, Contracts, § 498, p 683. We decline to address whether the law has developed to the extent that the statute of frauds also requires a writing to contain the "essential terms" of the contract, as suggested by *Opdyke, supra* at 369, and other cases.

is well settled that the memorandum may be made at any time, at least up to the time the action is brought to enforce the contract." *Id.* at § 22.8, p 743. Thus, the writing requirement of the statute of frauds may be satisfied by several writings made at different times.

Here, although the writings did not reflect all the details of the agreement, such as the length of the agreement, the writings may be considered with the admitted facts and extrinsic evidence showing the surrounding circumstances. Our Supreme Court rejected the notion that a writing "must contain every detail of the agreement" to satisfy the statute of frauds. *Goslin, supra* at 376. "[E]xtrinsic evidence may be used to supplement, but not contradict, the terms of the written agreement. In the absence of extrinsic supplemental evidence, the court may infer that the parties intended a 'reasonable' or 'good faith' term as part of the contract." *Opdyke, supra* at 367. Here, plaintiff does not dispute, for example, that it was an independent contractor under the DLO agreement, that the agreement was for a three-year term, or that the agreement only applied to DLO sales.

> [W]e should always be satisfied with "some note or memorandum" that is adequate, when considered with the admitted facts, the surrounding circumstances, and all explanatory and corroborative and rebutting evidence, to convince the court that there is no serious possibility of consummating a fraud by enforcement. When the mind of the court has reached such a conviction as that, it neither promotes justice nor lends respect to the statute to refuse enforcement because of informality in the memorandum or its incompleteness in detail. [4 Corbin, Contracts (rev ed), § 22.1, p 704.]

Therefore, the omission of some of the terms of the DLO agreement from the writings did not render the writings insufficient under the statute of frauds.

In regard to consideration, plaintiff concedes that the writings reflect that consideration was paid to plaintiff under the DLO agreement. But even if the writings did not express the consideration[2] for the DLO agreement, such an omission would not be fatal to the writings under the statute of frauds. The statute of frauds must be read in conjunction with MCL 566.136. *In re Skotzke Estate*, 216 Mich App 247, 251; 548 NW2d 695 (1996).[3] MCL 566.136 provides:

> The consideration of any contract, agreement or promise required by this chapter to be in writing, need not be expressed in the written contract, agreement or promise, or in any note or memorandum thereof, but may be proved by any other legal evidence.

In light of MCL 566.136, we agree with the trial court that the lack of expressed consideration in the writings does not affect the resolution of whether there is a writing sufficient to satisfy the statute of frauds.

We conclude that the commission checks, commission reports, and letters were sufficient writings to satisfy the statute of frauds under the test set forth in *Goslin, supra* at 376. The thirty-six commission reports in model years 1998 through 2000 reflected that defendant paid plaintiff the commissions that were based on a fixed rate of $21.86 a piece, and paid plaintiff two percent commissions in MY 1999 and 1.5 percent com-

---

[2] "To have consideration there must be a bargained-for exchange. There must be ' "a benefit on one side, or a detriment suffered, or service done on the other." ' " *Gen Motors Corp v Dep't of Treasury*, 466 Mich 231, 238-239; 644 NW2d 734 (2002) (citations omitted).

[3] Although *In re Skotzke Estate* involved MCL 566.109 rather than MCL 566.136, this Court observed that the two sections are virtually identical and stated that decisions under one section apply equally to similar questions arising under the other. *In re Skotzke Estate, supra* at 250 n 2, citing *Benedek v Mechanical Products, Inc*, 314 Mich 494, 511-512; 22 NW2d 901 (1946).

missions in MY 2000. These rates are consistent with the terms of the DLO agreement. Stehney signed and deposited the thirty-six commission checks for all three model years without making an objection. Further, signed letters plaintiff sent to defendant help demonstrate the existence of the DLO agreement. For example, Stehney wrote a letter to defendant on June 22, 1999, stating, "Kelly-Stehney has been most accommodating and flexible in yielding to your requests for adjusting our commissions over the past several years on the DLO program." Further, extrinsic evidence[4] and concessions made by plaintiff[5] supplement the writings by providing terms of the agreement not found in the writings signed by plaintiff. In applying the statute of frauds with " 'intelligence and discrimination,' " we conclude that the commission checks, commission reports, and letters have substantial probative value in establishing that the DLO agreement must exist. *Goslin, supra* at 376 (citation omitted). Therefore, the writing requirement of the statute of frauds is satisfied.

### 2. *QUALITY PRODUCTS & CONCEPTS CO v NAGEL PRECISION, INC*

Next, plaintiff argues that, under *Quality Products & Concepts Co v Nagel Precision, Inc,* 469 Mich 362; 666 NW2d 251 (2003), the trial court erred in determining that the parties mutually assented to the DLO agreement. In *Quality Products & Concepts, supra* at 364-365, our Supreme Court held:

---

[4] For example, defendant sent a letter to plaintiff on September 24, 1999, reminding plaintiff of the terms of the DLO agreement, including the three-year term of the agreement, the reduced scale of commissions through MY 2000, and the base price of $21.86 a piece. Plaintiff did not object to this letter.

[5] For example, plaintiff concedes that there was no dispute that the term of the DLO agreement was three years.

[P]arties to a contract are free to *mutually* waive or modify their contract notwithstanding a written modification or anti-waiver clause because of the freedom to contract. However, with or without restrictive amendment clauses, the principle of freedom to contract does not permit a party *unilaterally* to alter the original contract. Accordingly, mutuality is the centerpiece to waiving or modifying a contract, just as mutuality is the centerpiece to forming any contract.

This mutuality requirement is satisfied where a waiver or modification is established through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to modify or waive the particular original contract. In cases where a party relies on a course of conduct to establish waiver or modification, the law of waiver directs our inquiry and the significance of written modification and anti-waiver provisions regarding the parties' intent is increased. [Emphasis in original.]

Plaintiff argues that defendant has not produced clear and convincing evidence that plaintiff waived the written modification clause of the MRA[6] and modified the base price and commission rates under the MRA.[7] Plaintiff first points to an October 24, 1995, letter from plaintiff to defendant proposing a five-year extension of the MRA. Plaintiff argues that this letter indicates its unwillingness to agree to a commission rate or base price reduction under the MRA. However, as we previously explained, "The letter and proposed written MRA

---

[6] The written modification clause of the MRA states, "All modifications to this agreement must be in writing, signed by both parties, and attached hereto." Although we conclude that the writings regarding the DLO agreement satisfied the statute of frauds, these same writings did not satisfy the written modification clause of the MRA, as they were not signed by both parties and attached to the MRA.

[7] The DLO agreement does not modify the terms of the first three years of the MRA, but only provides for different commission rates under the optional extension of the MRA.

amendment, which were written more than one year before defendant proposed the terms of the oral DLO agreement, merely indicate that plaintiff wanted to extend the MRA—there is no indication that plaintiff would not agree to a reduction in commission rates or the base price in exchange for this extension." *Kelly-Stehney & Assoc, supra* at 619-620.

Next, plaintiff argues that the existence of an unsigned written version of the DLO agreement is evidence that it did not assent to modify the MRA. We addressed this argument in our previous opinion, *id.* at 620:

> Plaintiff also argues that its refusal to sign the written version of the oral DLO agreement proposed by defendant in MY 1998 shows its intent not to be bound by the terms of the oral DLO agreement. Plaintiff argues that, because the terms of the proposed written DLO agreement were more advantageous to plaintiff than the terms of the alleged oral agreement,[7] it would not be logical for plaintiff to refuse to sign the proposed written DLO agreement if it had agreed to the terms of the oral DLO agreement. We disagree. The proposed written draft of the oral DLO agreement was just that—a proposed draft. There is no evidence concerning why it was drafted, why it was sent to plaintiff, or why plaintiff did not sign it. Furthermore, the evidence shows that plaintiff continued to accept the lower commission rates after it refused to sign the proposed written DLO agreement and did not object to these rates or the base price of $21.86.

---

[7] . . . [T]he proposed written version of the oral DLO agreement provided that defendant would pay plaintiff 1.75 percent commissions in MY 2000, as opposed to the 1.5 percent commissions provided for in the oral DLO agreement.

Next, plaintiff points to the January 7, 2000, letter in which defendant stated that it was terminating the MRA. Plaintiff argues that, if defendant had believed that plaintiff assented to the DLO agreement, defendant would have stated that it was terminating the DLO agreement rather than the MRA agreement. We disagree that this letter shows that plaintiff did not assent to the DLO agreement. First, the DLO agreement was an extension of the MRA agreement. Defendant's reference to the MRA agreement when terminating the parties' relationship was a proper way to terminate the MRA agreement and its extension, the DLO agreement. Second, this letter was written by defendant and is not demonstrative of plaintiff's assent or lack of assent to the DLO agreement.[8]

Following the analytical framework set forth in *Quality Products & Concepts*, we conclude that there is clear and convincing evidence that plaintiff waived the written modification clause of the MRA and assented to lower commissions for DLO products. The MRA agreement provided that plaintiff would receive three percent commissions on new product sales and that all modifications to the agreement had to be in writing. When the three-year minimum term of the MRA was expiring, defendant told plaintiff that it would extend the MRA for three years under the condition that it would pay plaintiff DLO commissions on a reduced sliding scale at a $21.86 base price. MacDonald testified that Stehney orally agreed to the DLO agreement. Stehney did not testify that he did not agree to the DLO agreement when it was proposed by MacDonald. Instead, Stehney admitted that the terms of the DLO agreement were "dictated to me by Mr. MacDonald, not

---

[8] Further, there is written evidence that defendant believed that plaintiff had agreed to the terms of the DLO agreement. See n 4.

the way I wanted it, but that was dictated, yes." When plaintiff received a check for reduced commissions under the $21.86 base price, Stehney called MacDonald and objected to this amount. But when MacDonald told Stehney, "That's all you're going to get," Stehney accepted MacDonald's response.

Plaintiff accepted all the reduced commission checks by signing and cashing them. Plaintiff also signed the commission reports listing the commission rates and base price. Plaintiff's acceptance of the reduced commission rates is evidenced by plaintiff's June 22, 1999, letter to defendant.[9] After receiving commission checks in MY 2000, Stehney contacted MacDonald and asked him why the commission rate for DLO products was 1.5 percent rather than 1.75 percent. When MacDonald did not respond to Stehney's question, Stehney accepted the 1.5 percent commission rate and accepted the checks. Stehney admitted that he knowingly accepted checks with reduced commissions "[l]ike I accepted everything in the past . . . because Bob [MacDonald] could not be reasoned with, and I didn't want to lose my commissions." Stehney did not initially object to the reduced commissions because he knew that if he objected, defendant could exercise its right to cancel the agreement.[10] Plaintiff only objected to the

---

[9] As discussed earlier, plaintiff stated the following in its June 22, 1999, letter, "Kelly-Stehney has been most accommodating and flexible in yielding to your requests for adjusting our commissions over the past several years on the DLO program."

[10] Plaintiff argues that the reason it did not object to the reduced commission checks was because it wanted to "help the Defendant through a difficult time and it was Plaintiff's understanding that the reduced payments were going to be made up." However, this statement conflicts with Stehney's own testimony that (1) plaintiff accepted the reduced commission checks because it did not want defendant to exercise its power to terminate their business relationship and (2) plaintiff did not

reduced commission rates and base price after defendant terminated the contract three years after the DLO agreement was made.

Unlike the contract in *Quality Products & Concepts*, the MRA does not contain an antiwaiver provision.[11] Further, defendant's proofs do not rest on the mere fact that plaintiff knew that defendant was paying plaintiff commissions inconsistently with the MRA agreement but remained silent. The evidence shows that plaintiff not only cashed the commission checks that paid reduced commissions under the DLO agreement, but Stehney orally agreed to the terms of the DLO agreement because he did not want defendant to terminate the agreement. By these actions, plaintiff affirmatively waived the written modification clause of the MRA and accepted the oral DLO agreement as proposed by defendant.

Affirmed.

---

object when defendant told plaintiff that it would receive reduced commissions under the DLO agreement.

[11] The contract in *Quality Products & Concepts, supra* at 376, contained the following antiwaiver provision:

> *No delay, omission or failure* of [the defendant] to exercise any right or power under this Agreement or to insist upon strict compliance by Representative of any obligation hereunder, and *no custom or practice* of the parties at variance with the terms and provisions hereof *shall constitute a waiver* of [the defendant's] rights to demand exact compliance with the terms hereof; nor shall the same affect or impair the rights of [the defendant] with respect to any subsequent default of the Representative of the same or different nature. [Emphasis added in *Quality Products & Concepts.*]