GODWIN *v.* ACE IRON & METAL COMPANY.

1. DAMAGES—MATHEMATICAL PRECISION.
      Mathematical precision in the assessment of damages is not required, where from the very nature of the circumstances precision is unattainable, and particularly where it is defendant's own act or neglect that has caused the imprecision.

2. SAME—UNCERTAINTY.
      Sound policy requires that when damages cannot be estimated with certainty that there be cast upon the wrongdoer the risk of giving more than a fair compensation rather than risk of less than fair compensation to the injured party.

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 22 Am Jur 2d, Damages § 23.
[4] 30 Am Jur, Joint Adventures § 63.
[5] 30 Am Jur, Interest § 46.
[6] 39 Am Jur, Parties § 70.
[7–9] 5 Am Jur 2d, Appeal and Error § 839 *et seq.*
[10] 5 Am Jur 2d, Appeal and Error § 1014.

**3. JOINT ADVENTURES—FRAUD—NONJURY ACTION—EVIDENCE.**

Trial court's determination in nonjury action for fraud as to amount of steel defendants had not accounted for in connection with joint adventure in purchase of steel dies *held,* without error, in view of nature of records kept by defendants and proof that a quantity of steel had not reached the neutral weighing scales where it was to have been taken.

**4. SAME—FRAUD—PARTIES.**

Allowance of total sale price of unaccounted for steel less expenses of handling which plaintiff and defendants, as joint adventurers, had purchased from a seller was not error where the seller is not before the court, hence, claim that defendants may have to respond to the seller for amount it may have been cheated affords no basis for diminishing award to plaintiff under record presented.

**5. SAME—INTEREST.**

Recomputation of interest is required where original award by trial judge in action by one joint adventurer against the other joint adventurers had been for the total amount of damages for fraud in performance of contract plus interest and upon motion for new trial a credit was made for loading and freight without recomputation of interest on the reduced figure.

**6. SAME—RETRIAL—PARTIES.**

Retrial of action for fraud between joint adventurers in purchase of scrap steel dies from the seller will not be ordered, where the seller knew of the instant action without seeking intervention, having started an action against both plaintiff and defendant, and neither party had sought to make the seller a party prior to trial.

**7. SAME—JUDGMENT—EVIDENCE.**

Judgment for plaintiff joint adventurer for difference between amount for which some materials from a razed building were sold by one of the defendant joint adventurers and amount of purported accounting by another joint adventurer *held,* supported by proofs adduced in nonjury case.

**8. SAME—FINDING AS TO MISREPRESENTATION—EVIDENCE.**

Finding of trial court that plaintiff joint adventurer had failed to prove, by a preponderance of evidence, his claim of misrepresentation by defendant joint adventurers as to value per pound of materials taken from a dismantled building, is not disturbed.

9. Same—Counterclaims.

Determination as to merits of counterclaims by defendant joint
adventurers as to a third building dismantling job is ordered
on retrial, where no determination as to such claims appears
to have been made by trial court in nonjury action by metal
broker against defendant scrap metal dealers.

10. Same—Costs of Appeal.

Costs of present appeal are allowed plaintiff joint adventurer,
where awards as to him against defendants are affirmed
except for a recomputation of interest on 1 item, and case
is remanded for a determination of defendants' counterclaims.

Appeal from Wayne; Gilmore (Horace W.), J.
Submitted January 6, 1965. (Calendar No. 18, Dock-
et No. 50,282.) Decided October 4, 1965.

Case by H. Boyd Godwin, individually and doing
business as Godwin Metal Products, against Ace
Iron & Metal Company, a Michigan corporation,
Atomic Iron & Metal Company, a Michigan corpo-
ration, Ben Gladstone and Max Gladstone, individ-
ually, as officers of corporate defendants, and doing
business as Aetna Smelting & Refining Company, for
sums due on contracts by reason of fraudulent trans-
actions and concealment of profits. Counterclaim by
defendants. Judgment for plaintiff against defend-
ants Ace Iron & Metal Company and individual de-
fendants in varying amounts. Defendants appeal.
Affirmed in part as to fraudulent transactions. Re-
versed in part for redetermination of interest and
for allowance of and determination of counterclaim.

*Gussin, Weinstein & Kroll* (*William J. Weinstein,*
of counsel), for plaintiff.

*Shapero & Shapero* (*Edward Grebs,* of counsel),
for defendants.

Adams, J. Plaintiff sued and defendants counter-
claimed for fraud and breach of contract. Plaintiff

is a metal broker. As for defendants, Ace Iron &
Metal Company and Atomic Iron & Metal Company
are corporations maintaining scrap yards to buy,
process, and sell new and scrap metals; Aetna Smelt-
ing & Refining Company is a Ben and Max Gladstone
partnership; and Ben and Max Gladstone are officers
of Ace and Atomic.

Most of the facts with regard to three transactions
between plaintiff and defendants were strongly dis-
puted by defendants during a lengthy trial. Judge
Gilmore, jury having been waived, disbelieved de-
fendants, stating to their counsel:

"I was never more satisfied, I will say this for
the record right now, I was never more satisfied that
I was right on who was telling the truth and who
was lying in this case, I was never more satisfied
in any case than I was in this one. * * * I am
crystal clear your clients were lying throughout.
* * * I have never seen a group that I was so well
satisfied were lying."

As for the plaintiff's case, he stated:

"I believe the testimony of Godwin. I think he
was a forthright and honest witness, and I believe
the testimony of Wayne Beaver, William Meadows,
Charles Killingsworth, and Frederick Miller. I
think their testimony was straightforward."

From the record, we are satisfied the judge was
abundantly justified in his conclusion. We accept
plaintiff's version of the facts in determining wheth-
er the judge was correct in the verdict he reached
and in denying motion for a new trial.

## I. WILLYS MOTORS CONTRACT.

### (a) *The Fraud.*

Plaintiff Godwin, being without funds, contacted
Ben Gladstone about an opportunity to purchase 500

tons of dies from Willys Motors, Inc., at Ypsilanti, Michigan. They inspected the dies and concluded that there were far more than 500 tons of them. Ace agreed to provide financing. Plaintiff and Ace were to share profits and losses 50/50. Godwin, acting for Ace, successfully bid $44.76 a ton.

Ace was to make payment based upon certified weight slips. The scale of the Cronin Coal & Lumber Company, a neutral party, was to be used for any truckloads of dies. Hauling began October 12, 1956, and was finished November 19, 1956. The first three truckloads were hauled to Ace's yard. The rest were hauled to the Atomic yard. Defendants instructed the truckdrivers to come to the Atomic yard before going to the Cronin scale. Part of the loads was taken off. The trucks were then weighed at Cronin and the balance unloaded. Upon occasion, whole loads were taken to the Atomic yard without being weighed.[1]

Godwin was occupied at an American Motors' plant in Detroit and did not know what was happening. He asked for a statement but could not get one. Ben Gladstone told him the job had resulted in a loss. After several requests, in April, 1957, Gladstone finally told him they had lost $13,000.

Plaintiff filed a voluntary petition in bankruptcy listing Ben Gladstone as having a disputed claim in the amount of $6,500, one-half the purported loss, and was adjudged a bankrupt. Godwin then discovered the fraud that had been committed upon him. He filed a petition praying that the bankruptcy adjudication be set aside, and began this suit.

### (b) *The Extent of the Fraud.*

Plaintiff not only had the problem of establishing fraud but also of proving the extent of the conceal-

---

[1] Part of the dies were loaded on railroad cars and there is no controversy with regard to them.

ment and his consequent damages. Upon this appeal, defendants abandon the claim that there was no fraud and center their contentions around the claimed failure of plaintiff to prove his damages.

The chief attack is made on the testimony of Witus, a C.P.A. for plaintiff. We will come to his testimony presently. However, it should be borne in mind that, as the foundation upon which the expert accountant constructed his theory, plaintiff established in considerable detail certain facts about the defendants' operations to justify the theory.

The corporate defendants had been partnerships, among the Gladstones and other persons, until they were dissolved on May 28, 1956. They were then taken over by the Gladstones and incorporated July 1, 1956. In the negotiations for dissolution of the partnerships, the Gladstones had demanded that inventories of steel and scrap be liquidated as fast as possible. When their representative took charge of the yards on May 28, 1956, it was to liquidate any remaining inventory. From May through September, the yards were substantially empty of inventories. Sales were approximately equal to inventories and purchases for the period. Plaintiff established that the price of steel was excellent and so it was advantageous for defendants to sell everything they had on hand.

Defendants' sales of steel increased from October 1, 1956, to April 30, 1957, while the Willys dies were being processed. Most of the Willys dies were steel and would produce #1 steel. In the ordinary course of an operation such as defendants', the scrap which would be processed and sold would come from peddlers and other small operators. It would not produce substantial amounts of #1 steel. After April, 1957, defendants' operations in steel declined rapidly. A few months later there were no sales of #1 steel.

Plaintiff's problem of establishing the amount of the concealment was also complicated because of intercompany transactions between Ace and Atomic, because some of the records of Atomic had been burned, because the record of purchases was kept in dollars with minimal notations as to the type of material, and because beginning inventories were in dollars rather than in kinds of materials. On the other hand, there were accurate records of sales, both as to quantity and kind.

Harry Witus, C.P.A., witness for plaintiff, examined the books and records of the corporate defendants. Since the only accurate records were of sales, Witus sought a base period to determine what percentage #1 steel would normally occupy to total sales. Because of the short time defendants had been in business, he chose August and September, 1956. He divided total sales for those months into sales of #1 steel and determined that #1 steel comprised 5.02% of total sales. He reasoned that during other periods the defendants would purchase and sell #1 steel to the extent of 5.02% of their total sales. Witus applied this formula to uncover the amount of #1 steel not reported on the neutral scale.

Witus subtracted the amount of #1 steel the defendants reported as having received from Willys (2,377.2 tons) from total sales between October 1, 1956, and April 30, 1957 (31,985 tons). The result (29,607.8 tons) would represent the normal sales defendants would have made had they not entered into the Willys contract. Witus took 5.02% of this figure as representative of the amount of #1 steel which the defendants should have sold (1,486.3 tons). However, defendants' records, omitting the amount reported from Willys, revealed they had actually sold 3,806 tons of #1 steel. The excess (2,319.7 tons) over what normally would have been sold was

claimed to be the amount not reported on the neutral scale.[2]

Albert Goldman, C.P.A. and defendants' accountant, attacked the Witus procedure and attempted to show that the unaccounted for steel could have been generated from other purchases. From Goldman's analysis, defendants claim the Witus report was (1) not based upon the facts and figures disclosed by their books and records; (2) did not take into consideration purchases and inventory; (3) was based solely upon assumptions; (4) that the two-month period selected for making the formula were not normal months; (5) that the seven-month period from October 1, 1956, to April 30, 1957, was arbitrarily selected; (6) that there was no reason to combine the sales of Ace with those of Atomic; (7) that he did not analyze the actual shipments; and (8) that he assumed all of the dies taken from Willys Motors were heavy melting or #1 steel.

Throughout the trial, Judge Gilmore had insisted he would not do an accounting, that if many detailed transactions were to be examined they should be examined by the accountants and summaries prepared for him. Nevertheless he did permit all proofs either plaintiff or defendants elected to submit. On April 3, 1962, both sides rested without reservation. The court took the case under advisement, studied the reports of the two C.P.A.s, and then called in counsel. This is what happened:

*Judge Gilmore:* "I studied both reports and I didn't have the answer, so what did I do? I called you both in and I said, 'I am confused on the two accountants' reports.' I didn't give either of you an indication of how I was going to rule, but I said, 'I want the help of someone else.' At that time you

---

[2] The trial judge accepted this figure, but gave the defendants credit for the amount of #1 steel they had shipped in the period just prior to October 10, 1956.

didn't say, 'Well, send it to a commissioner.' I said, 'I want to appoint a C.P.A.' You said, 'Fine.' I said, 'Will you share the expense?' You said, 'Sure, both of you.' So then I waited and I got the C.P.A.'s report."

Albert E. Lee & Company was appointed to make an independent report which was submitted August 28, 1962, with copies to counsel. Final argument took place on November 2 and again on November 5, 1962. On the latter date the court rendered an oral opinion and gave judgment for plaintiff.

While the court used the Lee report to assist it in considering the testimony of Witus and Goldman, the court made its findings upon the basis of the Witus testimony *and that of the other witnesses for the plaintiff*. We have narrated the substance of that testimony in detail because it laid the foundation for the work of plaintiff's C.P.A. and the conclusions to be drawn from his analysis. The procedure used by Witus, in view of the other testimony, was a reasoned analysis and sufficient to support the inferences made by the expert and by the court. A strict accounting might have been the better way to get at the facts. Defendants, however, elected to maintain there had been no fraud. If there was no fraud, there was no need for an accounting. They can scarcely now complain because plaintiff made his proofs as best he could.

"But where injury to some degree is found, we do not preclude recovery for lack of precise proof. We do the best we can with what we have. We do not, 'in the assessment of damages, require a mathematical precision in situations of injury where, from the very nature of the circumstances, precision is unattainable.' Particularly is this true where it is defendant's own act or neglect that has caused the imprecision." *Purcell* v. *Keegan,* 359 Mich 571, 576.

The policy for this rule of damages was stated by Justice CHRISTIANCY:

"Since, from the nature of the case, the damages cannot be estimated with certainty, and there is a risk of giving by one course of trial less, and by the other more than a fair compensation—to say nothing of justice—does not sound policy require that the risk should be thrown upon the wrongdoer instead of the injured party? However this question may be answered, we cannot resist the conclusion that it is better to run a slight risk of giving somewhat more than actual compensation, than to adopt a rule which, under the circumstances of the case, will, in all reasonable probability, preclude the injured party from the recovery of a large proportion of the damages he has actually sustained from the injury, though the amount thus excluded cannot be estimated with accuracy by a fixed and certain rule." *Allison* v. *Chandler,* 11 Mich 542, 554.

See, also, *Gilbert* v. *Kennedy,* 22 Mich 116, 130, 131; *City of Kalamazoo* v. *Standard Paper Co.,* 182 Mich 476, 489; *Routsaw* v. *McClain,* 365 Mich 167. The court did not err in its determination of the amount of unaccounted for steel.

## (c) *The Award.*

Defendants next contend that the court erred in awarding plaintiff the total sale price of the unaccounted for steel less expenses of handling. The claim is that, if there is unaccounted for steel, a fraud has been committed upon Willys and that defendants will be obliged to respond to Willys for the fraud. The trial court found:

"This court cannot determine whether Willys was cheated or not. This court cannot make any finding on that because Willys has never come into this action, there is no showing here of what happened

to Willys, there is no showing of whether Willys participated in the cheating or not, or whether they did anything, so the court cannot make any definite finding of any kind as to Willys."

We agree with the court and consequently make no decision as to the rule of recovery had there been a determination that Willys was cheated.[3]

The court originally gave judgment on the Willys contract for $53,108.41 plus interest in the amount of $15,047.34. Upon motion for new trial, he allowed defendants a credit of $4,084 for loading and $2,554.50 for freight. However, he did not recompute interest on the reduced figure. This should be done upon remand.

### (d) *Willys' Intervention.*

Appellants further complain that the court erred in rendering a judgment for plaintiff for the total concealed tonnage when the court knew that Willys had instituted suit against plaintiff and defendants. Willys, fully cognizant of the situation, did not elect to intervene in this case. Neither plaintiff nor defendants sought to make Willys a party. The proposition that the case should now be retried when neither Willys nor any of the parties to this action sought to make Willys a party prior to trial is without merit.

### II. AMERICAN MOTORS HEAT-TREAT CONTRACT.

The second transaction between plaintiff and defendants involves a contract entered into by plaintiff and Ace Iron & Metal Company with American Mo-

---

[3] See the cases collected in support of the following found in annotation, 32 ALR2d 1345, 1388: "It is a basic legal principle that an innocent plaintiff suing on a legal and moral contract cannot be defeated by a plea of the defendant's own misconduct or, as it is otherwise stated, the defendant's own iniquity shall not be set up against an innocent party."

tors Corporation for wrecking and removal of a building. Plaintiff's proofs established that Ace sold certain of the materials—alloys, copper and brass—to Aetna at a low price and later Aetna sold the materials at a higher price. Defendants gave plaintiff a purported accounting at peddlers' prices, not those obtained by Aetna. The court awarded plaintiff judgment. The proofs support that judgment. We can find no error.

### III. AMERICAN CONTRACT ON THE LOADING DOCK & BUILDING.

The third contract called for the dismantling of another American Motors' building. Plaintiff contended that defendants misrepresented the value per pound of the materials. Plaintiff was the only one to testify. The trial judge ruled that he had not proven his claim by a preponderance of the evidence. We agree.

### IV. COUNTERCLAIMS OF DEFENDANTS.

While the previous American Motors contract was being carried out, American Motors decided to dismantle a third building. It entered into a contract with plaintiff to do this for $1,125. Defendants contend that the receipt of this money was made known to them only at the inception of this suit, and that it should have been divided with them. The judge did not mention the $1,125 in his opinion. Plaintiff testified:

"*Q.* Then you said you made a deal with the Gladstones that they were to get 50% of it [the $1,125]?

"*A.* We made a deal on the rails too, [the third contract] 50% of that, which I never received any money. * * *

"*Q.* But it belonged to the both of you?

"*A.* I never denied that."

The plaintiff also admitted he received $600 from one of the defendants. It appears that the money was advanced on an American Motors contract. Ben Gladstone also testified that the plaintiff was advanced an additional $2,125.

In view of the statements made by plaintiff, there should have been a determination of the merits of defendants' counterclaims.

## V.

The judgment on the Willys Motor contract is affirmed save for a redetermination of interest. The judgments on the American Motors' heat-treat plant contract and the American Motors wrecking job contract are affirmed. The case is remanded for a determination of defendants' counterclaims. Costs of this appeal are awarded to appellee.

T. M. KAVANAGH, C. J., and DETHMERS, KELLY, BLACK, SOURIS, SMITH, and O'HARA, JJ., concurred.