**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 13a0452n.06**

**Nos. 12-1426/1704**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SHERRY TROST, | ) | **FILED** |
| | ) | May 7, 2013 |
| Plaintiff - Appellee/Cross-Appellant, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| ZACHARY TROST, husband and wife; | ) | STATES COURT FOR THE |
| KIM TROST, husband and wife, | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendants - Appellants/ | ) | |
| Cross-Appellees. | ) | **OPINION** |

Before:  DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  This appeal arises from a dispute between members of the Trost family.[1]  A jury found Sherry Trost's stepson and his wife, Zachary and Kim Trost, liable for converting Sherry's property, and determined that Zachary alone breached a contract he and Sherry made.  Ruling on Zachary and Kim's post-verdict motion for judgment as a matter of law, the trial court let the jury's judgment stand on the conversion claim, but reversed it on the contract theory.  Both sides now appeal their losses.  While the court below correctly refused to second-guess the jury on the conversion claim, we conclude that it wrongly interposed a statute-of-frauds defense to reverse the jury's verdict on the contract claim.  As a result, we **AFFIRM IN PART**, **REVERSE IN PART**, and **REMAND** for the court below to reinstate the jury's verdict.

---

[1]There are five Trosts involved in this case, so we refer to them by their first names for ease.

# I. BACKGROUND

The following undisputed facts summarize the events leading up to the death of the Trost

family patriarch, which precipitated the conflict at the center of this matter:

> Plaintiff, Sherry Trost, is the widower of Fred Trost. Fred Trost started a television show in Michigan in 1982, titled Michigan Outdoors. Michigan Outdoors was a dba of Fred Trost Enterprises, Inc. Fred Trost Enterprises, Inc. accumulated significant debts, including, but not limited to, a significant multi-million dollar civil judgment known as the "Buck Stop Judgment." Plaintiff married Fred Trost on July 29, 1988. Later the show was operated by the corporate entity Michigan Sportsman Development Association and the name of the show was changed to "Practical Sportsman." Michigan Sportsman Development Association became Practical Sportsman, Inc. in 1992. Practical Sportsman Inc. was later changed to a nonprofit corporation, Practical Sportsman Foundation. The "Michigan Outdoors" tape library owned by Fred Trost Enterprises, Inc. was bought by ZNT Marketing, Inc, a company owned by Zachary Trost and JoAnn Cribley at he [sic] auction held when all the assets related to the television show were seized due to the Buck Stop Judgment.

> Fred Trost continued to operate his show[;] however[,] the debts from Fred Trost Enterprises, Inc. followed Fred Trost and made it impossible for him to own or operate the show in his own name or to own any assets of the show. In fact, Fred Trost was going to have to shut down the show and the business because of the debt. Fred Trost was to receive a significant inheritance from his parents upon their passing[;] however[,] these funds would not be available in time to save the show. Plaintiff and nonparty JoAnn Cribley agreed to take ownership of the show and its assets and agreed to take on the show's debts in their names so that Fred Trost could continue to operate the show. Plaintiff and JoAnn Cribley became officers and owners of Practical Sportsman, Inc.

> In 2002, a non-profit corporation, Practical Sportsman Foundation, was set up in order to continue the operation of the show. Again, JoAnn Cribley and Sherry Trost were officers of Practical Sportsman Foundation. Practical Sportsman Foundation took on debts of the previous business entities and incurred additional debt. Fred Trost remained in charge of the running of the business, including finances and bookkeeping.

> Plaintiff took a second mortgage on her home so Practical Sportsman Foundation could obtain an operating loan in the amount of $36,000.00. Practical Sportsman Foundation incurred at least $56,797.06 payroll tax liability to the Internal Revenue Service. Plaintiff ultimately paid that tax liability out of her personal funds

after the filing of this lawsuit because the IRS had frozen her assets. She used money from her retirement account and incurred additional tax liability for using her retirement funds.

Practical Sportsman Foundation incurred additional tax debt to the state of Michigan of approximately $16,000.00. Practical Sportsman borrowed an additional operating loan of $9,000 to support the show and the business. Because Plaintiff and JoAnn Cribley were the legal owners and financiers of Practical Sportsman Foundation, they were ultimately liable for the loan and tax debts.

Fred Trost became suddenly ill in May 2007. After several months in the hospital, Fred Trost passed away in July 2007 prior to receiving his inheritance or paying any of the debts from the show.

Defendant Zachary Trost is the son of Fred Trost and [stepson] of Plaintiff Sherry Trost. Defendant Kim Trost is the wife of Zachary Trost. Zachary Trost worked on the show with his father over the years and he and/or his company owned a museum and published a magazine related to the show.

Fred Trost predeceased one of his parents and never received the inheritance. Zachary Trost and [his sister] Tara Trost received an inheritance from Fred Trost's parents.

When Fred died in July 2007, Sherry says that she agreed to give Zachary the assets she owned related to Fred's show—mostly videotapes of original show episodes, raw footage, and assorted show memorabilia—in exchange for Zachary paying off the debts Sherry incurred running the show, including tax debts and outstanding loans. Zachary took the assets from Sherry and tried to profit from them by, for example, selling DVDs of old episodes on the internet. But despite Sherry's repeated requests over the next two years that he pay off the debts, Zachary ignored her. And when she ultimately demanded that he return the assets, Zachary refused.

In June 2009, Sherry sued Zachary and Kim. She alleged multiple counts, but only two are relevant here. First, Sherry asserted nearly $109,000 in contract damages stemming from Zachary's

alleged failure to pay the business debts. Second, she advanced a common-law conversion claim against both Zachary and Kim to recover the value of the property converted.

Zachary and Kim moved for summary judgment. On the contract claim, the court held that Sherry presented sufficient evidence to support the existence of an oral contract. But it reserved the question of whether the oral contract was subject to the statute-of-frauds provision in Michigan's version of the Uniform Commercial Code (UCC), which applies to the sale of goods. And on the conversion claim, the court concluded that Sherry's claim presented factual issues regarding whether Zachary's possession of the assets was inconsistent with Sherry's rights.

A three-day jury trial was held in February 2012. In her case-in-chief, Sherry took the stand, put on three witnesses, and submitted nearly two dozen exhibits. The trial evidence detailed the property at issue, how Sherry came to own it, the circumstances surrounding the formation of Sherry's contract with Zachary, Sherry's partial performance of it, and Zachary's breach. Sherry testified that the property at issue consisted of the video library from Fred's show and miscellaneous memorabilia. The latter included video editing equipment, show props, wildlife mounts, rifles, shotguns, hunting and fishing equipment, and a shotgun reloading machine.

Sherry and JoAnn Cribley—Fred's long-time business associate and an officer of the corporate entity that took on the debts at issue—both testified that these assets were seized after the "Buck Stop Judgment" was entered against Fred. ZNT Marketing, Inc. (ZNT), an entity owned jointly by Zachary and JoAnn, purchased the assets at the bankruptcy auction. Sherry testified that when ZNT ran into financial troubles, Fred arranged for ZNT to transfer the video library to Sherry in exchange for payment of ZNT's debts. JoAnn offered consistent testimony. She related that when

Zachary "folded up" ZNT, Michigan Sportsman Development Association (an entity in which she and Sherry were officers) paid off ZNT's debts, and ZNT signed over to Sherry the video library and all the other assets. JoAnn testified that she cut the checks to ZNT.

At or near the time of Fred's death, Sherry further explained, Zachary offered to pay the debts she incurred over the years to keep the show running in exchange for the video library, the memorabilia, and other property related to the show. Sherry said they discussed the offer on several occasions and that she accepted it. She never put the agreement in writing, though, because she did not think it was necessary to do so with a person she considered her son.

Others knew of the arrangement, too. JoAnn testified that she attended a dinner after Fred passed away where Zachary said he wanted to protect his father's legacy and would pay the show's debts in exchange for the property. Jason Marshall, Sherry's son and Zachary's stepbrother, also told the jury that he discussed the debts and the agreement with Zachary while Fred was in the hospital. And Deborah Guinn, Sherry's former sister-in-law, testified that she spoke with Zachary about taking care of the show's debts after Fred died.

Sherry kept the property at issue in a storage unit and in her home. In July 2007, after Sherry gave Zachary the key to the storage unit, he took the items from both locations to the home he and Kim shared. In the months that followed, Sherry repeatedly tried to speak with Zachary about paying the debts. But he would not return her calls. Sherry also tried communicating with Zachary via email. In one message, dated September 11, 2008, she suggested that she "would not object (and neither would Fred) to selling the tape library, [Fred's] guns and other assets to help pay off the debts." Zachary responded five days later: "Let me know how and when you would like to 'take

back' the guns and video library . . . . I have spoke [sic] to the family and if you are able to determine a fair market value on the video library, the family might be interested in purchasing it." Through counsel, Sherry later demanded that Zachary return her property, but he never did.

JoAnn also corresponded with Zachary on numerous occasions about the agreement he made with Sherry. The emails they exchanged reflect Zachary's efforts to raise money by selling videos and memorabilia to Fred's fans. He hoped, for example, to "maximize the possible sales" of the tapes, and related that his "plans all along have been to use some of that revenue to help the cause." Zachary's emails further indicated his intent to "help [JoAnn] and Sherry out" and documented his travails to gets his sister, Tara, to pitch in. They also make plain that he was directly involved in dealing with Sherry's IRS debts. Zachary hired a lawyer to "handle dealing with the IRS on Sherry Trost and Joann Cribley's behalf." Zachary wrote to the lawyer: "We would like your firm to try to make a settlement, (hopefully eliminating penalties and interest and getting it lowered as much as possible considering the current situation) and resolve their tax problems."

When Sherry concluded her case-in-chief, Zachary and Kim rested their case without providing testimony or evidence, moving instead for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The court took the motion under advisement and submitted the case to the jury. The jury awarded Sherry $194,725.30 on the breach-of-contract claim, which included the contract price, prejudgment interest, and consequential damages. And it separately found both Zachary and Kim liable on the conversion claim, awarding Sherry $108,797.06 for each one's tortious conduct.

A month after the jury issued its verdict, the court granted Zachary and Kim's post-trial motion on the breach-of-contract claim, but denied it on conversion. The court analyzed Sherry's contract claim under Michigan's UCC because it involved the sale of goods for more than $1000. *See* Mich. Comp. Laws § 440.2201(1). It concluded the contract could not be enforced because Sherry failed to present "a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." *Id*. The court observed that the emails Zachary sent to Sherry or JoAnn did not meet the writing requirement. The one email Zachary sent Sherry on September 16, 2008, for example, failed to "set forth any terms of the alleged contract." And although Zachary's emails to JoAnn reflected his attempts to raise money and address the show's financial problems, they did not elucidate "the terms of the purported contract." The terms unclear, the court vacated the jury's verdict on the breach-of-contract claim.

In contrast, the court readily rejected Zachary and Kim's challenge to the conversion claim. It noted ample evidence showing that Sherry controlled the video library and the memorabilia, which she gave Zachary as part of the bargain to pay off debts she incurred running Fred's show. Zachary's email asking Sherry "how and when" she wanted to "take back" the property, as well as his overture to buy it from her, supported the view that the property was Sherry's. Zachary and Kim never suggested that they owned the property, or that Sherry did not. The court found the evidence fully supported the jury's conclusion that Sherry owned the property or, minimally, had an interest in it superior to theirs, and that the duo acted tortiously in keeping it after Sherry demanded its return.

The court also rejected Kim's argument that the evidence was insufficient to hold her liable for conversion. Kim was involved in initially taking possession of the property and was "fully

aware" of the negotiations between Zachary and Sherry. The jury, for example, was presented with an email Kim wrote to JoAnn on August 12, 2008, lamenting that if "the stock market had not dropped like it did, we would be able to pay off all the bills and everyone would be happy," and relating the difficulties of getting Tara to "come through to get the bills paid." In another email, responding to JoAnn's observation that Zachary "has thrown in the towel on the mess his dad left behind," Kim acknowledged that Zachary "feels like this is all his problem" because "his dad left him with this debt and he is responsible for it." And later, after Sherry demanded the return of her property, Kim did nothing, even though some of it was in her home. As neither Zachary nor Kim took the stand to contest any of this, the court concluded, the jury could reasonably find both defendants liable for conversion.

Zachary and Kim appeal the denial of their motion for judgment as a matter of law on Sherry's conversion claim. Sherry cross-appeals the court's grant of that motion as to her breach-of-contract claim. The parties properly invoked the diversity jurisdiction of the court below, 28 U.S.C. § 1332(a), and we have jurisdiction to review the magistrate's entry of judgment, *id*. § 636(c)(3).

## II. ANALYSIS

We assess de novo a district court's grant or denial of judgment as a matter of law under Rule 50. *Snyder v. AG Trucking, Inc.*, 57 F.3d 484, 490 (6th Cir. 1995). When a Rule 50 motion in a diversity case challenges the sufficiency of the evidence, we apply the standard of review of the forum state whose substantive law governs the action—which here is Michigan. *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 466 (6th Cir. 2009). The state-law counterpart of a Rule 50 motion in Michigan is a motion for a "directed verdict" or "judgment notwithstanding the verdict." *Id*. at

467.  We may upend the jury's verdict in this case only if, after "viewing the evidence and all legitimate inferences in the light most favorable to" Sherry, *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 857 (Mich. 2005), "reasonable minds could not differ on a factual question," *Chouman v. Home Owners Ins. Co.*, 810 N.W.2d 88, 93 (Mich. Ct. App. 2011).  But if the evidence makes out Sherry's prima facie case, we may not direct a verdict for Zachary and Kim.  *Caldwell v. Fox*, 231 N.W.2d 46, 49 (Mich. 1975).

## A.  Conversion

Zachary and Kim press four arguments that boil down to a claim that Sherry did not meet her burden to establish the elements of conversion.  None are persuasive.

*First*, they maintain that the video library is not chattel because the imagery on the videotapes is intellectual property.  They reason that because Michigan has not extended the tort of conversion to intellectual property, the video library cannot be the subject of a conversion action.  Conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with" another's rights in it.  *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992).  "[E]very species of personal property which is the subject of private ownership, whether animate or inanimate," can be converted.  *Id.* at 610 n.3 (internal quotation marks omitted).

Videotapes—to say nothing of the memorabilia also at issue here—are obviously chattels that can be converted.  Zachary and Kim hauled away personal items that belonged to Sherry, and stored them in their home and a storage unit.  When Sherry demanded that they return her property, she tried to get back the very same boxes of videotapes and memorabilia.  Zachary and Kim neither explain why these items are not chattels, nor point to evidence that even remotely suggests that

Sherry transferred intellectual property rights to them. Because their argument fails at the first step, we have no need to consider whether Michigan law cognizes conversion of intellectual property.

*Second*, Zachary and Kim contend that Sherry did not establish she was the owner of the videotapes and memorabilia. The only evidence as to ownership, they say, is that Zachary purchased the videotapes and memorabilia at the bankruptcy auction. Apart from that, Sherry can only lay claim to Fred's property by virtue of their marriage, as Fred died without a will, and her claim must come through a probate proceeding.

We think this argument is a red herring. The parties stipulated that Fred could not and did not own any property related to the show. They also agreed before trial that Sherry and JoAnn took "ownership of the show," including its assets and debts. Zachary and Kim presented no evidence to the contrary, and cite no relevant law to support their claim on appeal. This claim fails. And the evidence as to when and how Sherry became the property owner was more than sufficient to support the jury's verdict. JoAnn specifically said that she cut checks to ZNT, the entity she and Zachary controlled, to transfer the video library and other property to Sherry. No witness disputed Sherry's ownership, and each one corroborated that Zachary and Kim took the property from Sherry. Moreover, the jury was presented with Zachary's email to Sherry offering to buy the video library from her and asking her "how and when" she would like to take back the property. Based on this evidence—which we view in the light most favorable to Sherry—the jury stood on firm ground in concluding that Sherry owned the video library and memorabilia.

*Third*, Zachary and Kim argue that because Sherry presented no evidence of the value of the videotapes and the memorabilia, the jury could not properly surmise one. Since no one knew

specifically what was converted—*i.e.*, the number of videotapes, the types of rifles, or the age of the editing equipment—Zachary and Kim question how the jury could fix Sherry's damages at $108,797.06 for each one's acts. Sherry answers that the value of the property inhered in the bargain the parties struck.

The rules governing conversion damages in Michigan are long established. The usual damages measure is the fair market value of the property when it was converted. *Larson v. Van Horn*, 313 N.W.2d 288, 295 (Mich Ct. App. 1981) (citing *Baxter v. Woodward*, 158 N.W. 137 (1916)). The fair market value, in turn, is the price that a seller will accept and a buyer will pay in an arm's-length transaction on the open market. Black's Law Dictionary 1691 (9th ed. 2009). But where property is irreplaceable or does not have a market value—as may be the case with, say, family pictures and heirlooms—damages may be based on the property's value to the owner, as long as it is "susceptible of pecuniary measurement which is not fanciful or merely speculative." *Bernhardt v. Ingham Reg'l Med. Ctr.*, 641 N.W.2d 868, 871 (Mich. Ct. App. 2002) (quoting *Rose v. Lewis*, 10 Mich. 483, 1862 WL 1119, at *2 (Mich. 1862)).

Moreover, Michigan courts do not require damages to be calculated with mathematical precision if the circumstances make that unattainable. *Willis v. Ed Hudson Towing, Inc.*, 311 N.W.2d 776, 778 (Mich. Ct. App. 1981) (citing *Godwin v. Ace Iron & Metal Co.*, 137 N.W.2d 151, 156 (Mich. 1965)). This is particularly true if the inexactness is due to the converter's conduct, in which case "[p]ublic policy demands that . . . the risk of giving more than fair compensation be cast upon the wrongdoer." *Id*. (citing *Godwin*, 137 N.W.2d at 156). And where liability is proven,

difficulty in determining damages will not bar recovery. *Id*. at 779. "We do the best we can with what we have." *Purcell v. Keegan*, 103 N.W.2d 494, 496 (Mich. 1960).

Thousands of videotapes from a television show that ran for decades, along with assorted items whose significance springs from their association with a deceased patriarch, have no readily ascertainable market value. So it was appropriate for the jury to set the value of the property when it was converted by the amount of the debts that Zachary agreed to pay in exchange for it. "In nearly all jurisdictions, including Michigan, the owner of a chattel is competent to testify as to its value." *Kailimai v. Firestone Tire & Rubber Co.*, 273 N.W.2d 906, 909 (Mich. Ct. App. 1978). Beyond that, every witness testified about the terms of the deal Sherry struck with Zachary. And the jury heard nothing from Zachary suggesting he balked at the price.[2] At bottom, his acquiescence to the bargain's terms take Sherry's estimate of the property's value far from the realm of the "fanciful or merely speculative." *Bernhardt*, 641 N.W.2d at 871 (internal quotation marks omitted).

One more point regarding Sherry's burden to establish the value of the property. The argument by Zachary and Kim that Sherry cannot prevail on her conversion claim because she did not produce the converted assets or describe them with sufficient specificity finds answer in Michigan law. If anything stood in the way of a precise value calculation, it was the couple's possession of the assets and undisputed refusal to give them up. In line with Michigan's policy

---

[2]One arguable exception to this is Zachary's email to Sherry saying his family would consider purchasing the video library from Sherry for "a fair market value." But this only suggests Zachary questioned the value *after* converting Sherry's property, which does not help him cast doubt on the property's value at the time it was converted, as Michigan requires.

judgment, the jury cast on the converters the risk "of giving more than fair compensation." *Willis*, 311 N.W.2d at 778.

*Fourth*, Zachary and Kim press the view that Kim cannot be liable because Sherry offered no evidence that she participated in any wrongdoing. The evidence suggests otherwise. The record shows that Kim participated in taking Sherry's property, equally possessed it in her home, knew that Sherry demanded its return, and aided in the refusal to comply. Sherry testified that Kim helped her husband move the property to their home. Kim knew that she and Zachary had property for which Sherry expected payment, but explained to JoAnn that stock market losses made it difficult to come up with the money. Kim also confirmed Zachary's aim to honor the agreement in emails to JoAnn. Later, when Sherry's attorney sent a written demand to their home seeking return of the property, neither Zachary nor Kim responded. And in spite of being sued almost three years before the jury was impaneled, the property remained in their joint home. The jury's verdict as to Kim easily stands.

As none of Zachary and Kim's attacks on the jury's verdict on Sherry's conversion claim are convincing, we affirm the trial court's denial of the couple's motion on this ground.

## B. Breach of contract

Sherry cross-appeals from the trial court's decision to vacate the jury's verdict against Zachary on her breach-of-contract claim. Having instructed the jury that Michigan's UCC governed this claim, *see* Mich. Comp. Laws § 440.2201(1), the court below concluded that none of the evidence—singularly or taken together—met the statute's writing requirement because it did not sufficiently set forth the alleged contract's terms.

Sherry argues on appeal that Michigan's statute of frauds is not a bar to enforcing the contract for two reasons. First, she maintains that her case comes within the statute's partial-performance exception, *see* Mich. Comp. Laws § 440.2201(3)(c), which allows a contract that has been partially performed to be enforced even if it does not meet the writing requirement. Sherry contends that she can stave off the need for an adequate writing because she performed her part of the bargain, transferring the assets to Zachary and Kim, which they accepted.[3] Second, she says the writings in evidence—mostly emails between Zachary on the one hand, and Sherry or JoAnn on the other—were legally sufficient to satisfy the statute of frauds. Because we agree with Sherry's first argument, we do not consider her second one.

Michigan courts will not enforce a contract for the sale of goods over $1000 unless a writing, signed by the party it is charged against, sufficiently indicates a contract between the parties. *See id*. § 440.2201(1). The writing requirement exists to "afford a basis for believing that the offered oral evidence rests on a real transaction." *Id*. § 440.2201 cmt. 1. It does not demand that every relevant contract term be enumerated.

But an otherwise valid agreement is enforceable absent a writing if the contracted-for goods "have been received and accepted," *id*. § 440.2201(3)(c), as this act is "an unambiguous overt admission" that a contract "actually exists," *id*. § 440.2201 cmt. 2; *see also W. Cent. Packing, Inc. v. A. F. Murch Co.*, 311 N.W.2d 404, 409 (Mich. Ct. App. 1981) ("partial performance can be shown by the receipt and acceptance of the goods, notwithstanding any other possible explanations for

[3]The trial court did not consider Sherry's partial-performance argument, even though she made it in her opposition to summary judgment, and requested that the jury be instructed on it.

defendant's actions"). A buyer accepts goods if, after a "reasonable opportunity" to look them over, he indicates to the seller that they meet his expectations, fails to reject them, or engages in "any act inconsistent with the seller's ownership" of them. Mich. Comp. Laws § 440.2606 (1). Even without a writing, a seller can recover "the agreed price of any goods actually delivered," as long as a court can make a "just apportionment." *Id*. § 440.2201 cmt. 2.

Moving from the general to the specific, Sherry says she performed her part of the deal—she delivered the video library and memorabilia to Zachary—but he did not—he failed to pay down the debts his father incurred in Sherry's name. The trial evidence leaves no doubt that Zachary received and accepted the goods. Sherry testified that she gave Zachary these assets, which remain in his possession (almost six years after the transfer, at this point). All three witnesses corroborated this, and Zachary did not dispute it.

Zachary also used these assets in his own business venture—transferring the video footage to DVDs, packaging memorabilia items, and selling both online. That Zachary retained the goods and put them to work for his own account make his acceptance clear enough. But it also shows that he acted in a manner inconsistent with Sherry's ownership of them. When Sherry requested that he return the goods to her 14 months after he took possession, Zachary did not comply. And when he was deposed in October 2009, he testified that he threw away the majority of the tapes.

Sherry's one-sided performance erased her need to show a writing memorializing the agreement. The trial court erred in vacating the jury's verdict on the basis that the writing requirement was not met. If "there is no serious possibility of consummating a fraud" by enforcement, refusing enforcement "neither promotes justice nor lends respect to the statute."

*Kelly-Stehney & Assocs., Inc. v. MacDonald's Indus. Prods., Inc.*, 693 N.W.2d 394, 399 (Mich. Ct. App. 2005) (quoting 4 Joseph M. Perillo, Corbin on Contracts § 22.1 (rev. ed. 2003)). Reflexive application of the rule on these facts would be likely to work an injustice, and is unnecessary here.

To determine whether the jury had enough raw material to judge that Zachary entered into and then breached a contract, we need to first establish the elements a UCC-compliant agreement must contain. An enforceable writing does not need to incorporate "all the material terms of the contract." Mich. Comp. Laws § 440.2201 cmt. 1. Indeed, the "*only* term which must appear is the quantity term," though even this does not have to be "accurately stated." *Id*. (emphasis added). A UCC contract is enforceable as long as a court can determine the parties "intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." *Id*. § 440.2204(3).

Within these legal parameters, the evidence was sufficient for the jury to make out the relevant quantity terms and the parties' intent to contract. First, the jury had abundant evidence to figure out the quantity terms on both sides of the deal. As to what Zachary got, multiple witnesses testified to the library's contents—thousands of tapes kept in boxes in Sherry's home and a rented storage unit—and what the memorabilia consisted of—wildlife mounts, rifles, shotguns, hunting and fishing equipment, a shotgun reloader, props from Fred's show, and other items. Zachary's question to Sherry concerning how she wanted to take the property back assumes he possessed a defined set of items, and stands as an admission that the quantity of goods could be measured.

On the other side of the deal, Sherry presented evidence of the debts she paid off after Zachary breached their agreement. This included a letter from the IRS detailing her tax liability and the check she wrote to settle it. It contained state and federal tax returns reflecting the penalties

Sherry incurred when she liquidated her retirement account to pay off the tax liabilities. And it included a promissory note she signed when she took out an operating loan for the show, and a settlement statement showing it had been paid down. Taken together, this evidence was sufficient to specify an ascertainable quantity, providing the jury "a reasonably certain basis for giving an appropriate remedy." *Id*. § 440.2204(3).

There was ample evidence to support the parties' intent to contract as well. Multiple witnesses testified that Zachary promised to pay the debts Sherry took on when operating Fred's business. Zachary's emails acknowledged the obligations to be paid off. No testimony disputed Zachary's possession of the property at issue. And his emails detailed his attempts to profit from it. Zachary did not rebut any of this evidence or explain to the jury why, in his view, there was no deal.

In short, the jury was given more than enough evidence to decide the parties entered into a contract that Sherry performed. Her performance allows her to enforce the contract despite the absence of an adequate writing. Because the trial court mistakenly barred enforcement of this agreement, we reverse its grant of Zachary and Kim's post-trial motion on Sherry's breach-of-contract claim.

### III. CONCLUSION

For the reasons stated, we **AFFIRM IN PART**, **REVERSE IN PART**, and **REMAND** for the trial court to reinstate the jury's verdict. We conclude with a word regarding remand. Sherry is "entitled to complete relief" to compensate her for the harms she suffered. *Walraven v. Martin*, 333 N.W.2d 569, 574 (Mich. Ct. App. 1983). But as her sole injury is coextensive under the contract and tort claims she brought, Sherry is "not entitled to double recovery" for her damages. *Id*.

At trial, Sherry permissibly pursued all legal theories that were available to her, and the jury found for her on two of them. The trouble is that the jury verdict form failed to explain that damages for one claim may not be duplicative of damages awarded in another. So the jury awarded the full amount of Sherry's loss on the conversion claim against Zachary ($108,797.06), the full amount on the same claim against Kim ($108,797.06), and the full amount plus prejudgment interest and consequential damages on the breach-of-contract claim against Zachary ($194,725.30). This allowed for the possibility of double recovery.

The election-of-remedies doctrine—"the legal version of the idea that a plaintiff may not have his cake and eat it too"—works to prevent double recovery. *Hickson Corp. v. Norfolk S. Ry. Co.*, 260 F.3d 559, 566–67 (6th Cir. 2001) (internal quotation marks omitted); *see also Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451, 460–61 (Mich. Ct. App. 1989). It entitles a party to "the greatest amount recoverable under any single theory pled that is supported by the evidence." *Hickson Corp.*, 260 F.3d at 567. On remand, Sherry will be required to elect her remedy among the two theories found in her favor because, as our opinion makes clear, the evidence supported both.